[No. S083466. Aug. 6, 2001.]

MARILYN MERRILL et al., Plaintiffs and Appellants, v.
NAVEGAR, INC., Defendant and Respondent.

**COUNSEL**

Center to Prevent Handgun Violence, Dennis A. Henigan, Brian J. Siebel and Allen K. Rostron for Plaintiffs and Appellants.

McCutchen, Doyle, Brown & Enersen, Jane Elizabeth Lovell, Frank N. Hinman, Philip A. Ferrari; Vaca, Vaca & Ritter, Werner & Burke and Christopher G. Ritter for Plaintiffs and Appellants Marilyn Merrill, Donald Michael Merrill, Kristin Merrill and Michael Merrill.

Alper & McCulloch and Dean A. Alper for Plaintiff and Appellant Charles Lewis Ross.

Cotchett & Pitre, Frank M. Pitre and Mark Molumphy for Plaintiff and Appellant Michelle Scully.

Law Offices of Mitchell J. Green and Mitchell J. Green for Plaintiffs and Appellants Deanna L. Eaves and Roy B. Eaves.

Jaffe, Trutanich, Scatena & Blum and Fred M. Blum for Plaintiffs and Appellants Carol Marie Kingsley, Zachary Kingsley Berman and Jack Berman.

Morrison & Foerster, James B. Bennett, Cam Baker and Kimberly Echardt for Plaintiffs and Appellants Stephen Sposato, Jody Jones Sposato and Meghan Sposato.

Orrick, Herrington & Sutcliffe, Frederick Brown and Carl W. Chamberlain for Plaintiffs and Appellants Carol Ernsting and David Sutcliffe.

LeBoeuf, Lamb, Greene & MacRae, Charles Ferguson and Michael B. Schwarz for the Educational Fund to End Handgun Violence as Amicus Curiae on behalf of Plaintiffs and Appellants.

Latham & Watkins, Ernest J. Getto, Karen R. Leviton and Tanya M. Acker for Defendant and Respondent.

John H. Findley and Stephen R. McCutcheon for Pacific Legal Foundation as Amicus Curiae on behalf of Defendant and Respondent.

Hugh F. Young, Jr., and Harvey M. Grossman for the Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**CHIN, J.**—On July 1, 1993, Gian Luigi Ferri killed eight people and wounded six—and then killed himself—during a shooting rampage at 101 California Street, a high-rise office building in San Francisco. Survivors and representatives of some of Ferri's victims (plaintiffs) sued defendant Navegar, Inc. (Navegar), which made two of the three weapons Ferri used.

We granted review to determine whether plaintiffs may hold Navegar liable on a common law negligence theory. We hold they may not, because the Legislature has declared as a matter of public policy that a gun manufacturer may not be held liable "[i]n a products liability action . . . on the basis that the benefits of [its] product do not outweigh the risk of injury posed by [the product's] potential to cause serious injury, damage, or death when discharged." (Civ. Code, § 1714.4, subd. (a).)[1] That, in essence, is plaintiffs' theory of recovery here: that Navegar defectively designed the weapons Ferri used because, given their particular characteristics, the benefits of making them available to the general public—which were nonexistent—did not outweigh the risk they might inflict serious injury or death when discharged. The public policy the Legislature established in section 1714.4 precludes plaintiffs from proceeding on this theory. We therefore conclude the trial court correctly granted Navegar summary judgment, and we reverse the judgment of the Court of Appeal, which reversed the trial court's decision.

## FACTUAL BACKGROUND[2]

Navegar is a gun manufacturer located in Miami, Florida. Doing business as Intratec, it manufactured the TEC-9, a semiautomatic assault pistol, from 1988 to 1992.[3] In 1992, Navegar renamed the firearm the TEC-DC9 but did not alter its design or materials. Because Ferri used two of these unmodified

---

[1] All further statutory references are to the Civil Code unless otherwise indicated.

[2] We draw the background facts in part from the lead opinion in the Court of Appeal. Neither party sought rehearing in the Court of Appeal.

[3] We use the terms "assault weapon" and "assault pistol" because they have become widely accepted in law, popular usage, and within the gun industry. (See Pen. Code, § 12276, subd. (b)(4) [listing the "Intratec TEC-9" as an " 'assault weapon' "]; 18 U.S.C. § 921(a)(30)(A)(viii) [identifying the TEC-9 and TEC-DC9 as "semiautomatic assault weapons"]; Ladenheim & Ladenheim, Firearms and Ballistics for Physician and Attorney (1996) p.

TEC-DC9's at 101 California Street, we will refer to them interchangeably as TEC-9's, TEC-DC9's, or TEC-9/DC9's.

Navegar advertised the TEC-9/DC9 in a number of gun-related magazines and annuals, including Guns, Guns & Ammo, Combat Handguns, Petersen's Handguns, Heavy Metal Weapons, and Soldier of Fortune. A typical advertisement claimed that in light of the TEC-9/DC9's design features—including "32 rounds of firepower," a " 'TEC-KOTE' finish" and "two-step disassembly for easy cleaning"—the weapon is "ideal for self-defense or recreation," "stands out among high capacity 9mm assault-type pistols," and "deliver[s] more gutsy performance and reliability than ANY other gun on the market." Navegar also distributed an advertising brochure or catalog describing its guns and accessories, which it mailed to anyone interested and, on at least one occasion, printed in special issue magazines. In a page describing the TEC-KOTE finish, Navegar claimed the finish provided "natural lubicity [*sic*] to increase bullet velocities, excellent resistance to finger prints, sweat rust, petroleum distillates of all types, gun solvents, gun cleaners, and all powder residues. Salt spray corrosion resistance, expansion and contraction of the metal will *not* result in peeling of finish." A different brochure advertising to retailers used the slogan, "Intratec: Weapons that are as tough as your toughest customer."

Navegar included a manual with each TEC-9/DC9 it sold. The 1993 manual contained safety warnings, technical information, and operating instructions. It also claimed the gun was "a radically new type of semi-automatic pistol," which was "designed to deliver a high volume of firepower" and, "[t]hanks to its dimensions and designs," could "be used in modes of fire impossible with most handguns." Regarding the latter claim, the manual described and illustrated several recommended shooting positions, including "[h]ipfire at shortest range," a two-handed hold with the nontrigger hand placed on the upper part of the magazine well.

In early 1993, Ferri, a Southern California resident, bought a TEC-9 from the Pawn & Gun Shop in Henderson, Nevada, after several earlier information-gathering trips to the same store. According to the salesperson, Ferri looked at a wide variety of handguns, but seemed mainly interested in a "high capacity type" gun, "something relatively compact that holds a lot of rounds." He gave no indication he had previously heard of the TEC-9 or the Intratec brand. Despite the employee's efforts to steer him toward better

143; Ahern, *Intratec's TEC-9 Assault Pistol* (July 1988) Petersen's Handguns 38, 40; Long, Assault Pistols, Rifles and Submachine Guns (Paladin Press 1986) p. 3.) Navegar itself advertised the TEC-9 as an "assault-type pistol" because, according to its marketing director at the time, "that's how they're classified [by] the industry."

made, more expensive models, Ferri ultimately purchased a used TEC-9. Later that day, he returned the weapon, stating that he wanted a new gun instead.

On April 25, 1993, Ferri bought a new TEC-DC9 from Super Pawn, a gun store in Las Vegas, Nevada. Super Pawn had purchased the weapon from a gun distributor in Arizona, which had purchased it from Navegar. Ferri told the salesperson and another customer he wanted a gun for informal target shooting, or "plinking." The salesperson showed Ferri only the TEC-DC9 and a gun manufactured by Glock. Although Ferri did not initially ask for a TEC-DC9 by name or indicate he recognized the names Intratec or TEC-9, he did not appear interested in any other guns. Ferri questioned the other customer about the TEC-DC9 and the Glock. The customer said that people at a shooting range would "probably laugh at" Ferri if he used a TEC-DC9 "because it wasn't really an accurate weapon" and that a .22-caliber gun was better for "plinking" than a nine-millimeter gun because ammunition for the former was much cheaper. Ferri nevertheless chose the TEC-DC9.

Ferri purchased another TEC-DC9 on May 8, 1993, at a Las Vegas gun show from a Utah dealer. The dealer had purchased it from an Ohio distributor, which had purchased it from Navegar. As federal law required, the dealer transferred the gun to a Nevada retailer, who then delivered it to Ferri. The TEC-DC9 Ferri bought was the only handgun the Utah dealer displayed at the show, and the dealer's price ($210) was the lowest at the show for a TEC-DC9. The dealer recalled Ferri saying he already owned a TEC-9.

To purchase the new weapons, Ferri showed an apparently valid Nevada driver's license and answered required questions about his criminal history and residency. All of the distributors and retailers were licensed by the federal Bureau of Alcohol, Tobacco and Firearms, and, so far as the record shows, all of the transactions were legal under applicable federal and state gun control laws, other than Ferri's misrepresentations as to his state of residence.

On July 1, 1993, Ferri entered 101 California Street carrying the TEC-9/DC9's and a .45-caliber Norinco Model 1911A1 pistol in a large briefcase and another bag. He had added to the TEC-DC9's Hell-Fire brand trigger systems that made the weapons fire in rapid bursts, and he was equipped with hundreds of rounds of ammunition preloaded into 40- to 50-round magazines. He went to the 34th floor, to the office of a law firm he held a grudge against, and started shooting. During his rampage, he killed eight people and wounded six on three different floors, and then killed himself.

San Francisco police investigated Ferri's crimes. Inspectors Napoleon Hendrix and Prentice Earl Sanders led the investigation and concluded that Ferri used the TEC-9/DC9's firepower to "lay down" a field of fire that eliminated or reduced the opportunity of his intended victims to escape before he completed his attack. During a search of Ferri's apartment, the police found two TEC-DC9 manuals, one Intratec catalog (brochure), and two price lists. The catalog and price lists had a single fold, which, according to Navegar's customer service representative, was the invariable manner of folding catalogs for inclusion with TEC-9/DC9's the company sold; in contrast, mailed catalogs were folded twice or not at all. The brochure in Ferri's apartment did not state that the TEC-KOTE finish resisted fingerprints; instead, it stated, "excellent resistance to body perspiration, rust," etc. The police also found "numerous magazines advertising weapons and paramilitary equipment," including Soldier of Fortune and Guns. However, they preserved only a few of the magazines, none of which contained a Navegar advertisement. Inspector Sanders did "not recall" finding "any TEC-DC9 magazine advertisement in Ferri's apartment," and the inspectors found "no evidence" that any advertisement caused Ferri to travel to Nevada to purchase the TEC-DC9's.

## PROCEDURAL BACKGROUND

Plaintiffs' first amended complaint asserted a cause of action against Navegar for "common law negligence." In this claim, plaintiffs alleged that Navegar knew or should have known that: (1) the TEC-9/DC9 is a "small, easily concealable military assault weapon[]"; (2) it has "no legitimate sporting or self-defense purpose and is particularly well adapted to a military-style assault on large numbers of people"; (3) it is "disproportionately associated with criminal activity"; (4) it is "more attractive to criminals" because of its "firepower" and "other features"; (5) its "firepower was likely to be enhanced by the addition of products such as high-capacity magazines" and "the Hell-Fire trigger system"; and (6) it "would be used to kill or injure innocent persons in violent criminal acts such as the mass killing committed by Ferri." Plaintiffs also alleged that Navegar "acknowledges that publicity surrounding the [TEC-9/DC9's] reputation as a weapon favored by criminals increases its sales." Thus, plaintiffs alleged, Navegar "acted negligently by manufacturing, marketing, and making available for sale to the general public" the TEC-9/DC9.

The first amended complaint also asserted causes of action against Navegar for negligence per se and strict liability for an abnormally dangerous activity. As to the latter, plaintiffs alleged that Navegar was strictly liable because "making the [TEC-9/DC9] available for sale to the general public"

was "an abnormally dangerous activity." As to negligence per se, plaintiffs alleged that Navegar violated the Roberti-Roos Assault Weapons Control Act of 1989 (AWCA) (see Pen. Code, §§ 12275.5, 12276) by advertising the TEC-9/DC9 in California and that this advertising "was the direct and legal cause in bringing about plaintiffs' injuries" because it "was a substantial factor in causing Ferri to acquire" the Navegar weapons he used.

Navegar moved for summary judgment. As to common law negligence, it argued it owed plaintiffs no duty not to advertise the TEC-9/DC9 and that plaintiffs had no evidence Ferri saw or was affected by a Navegar advertisement.

In opposing the motion, plaintiffs argued that Navegar had misconstrued the ordinary negligence claim. They explained that, contrary to Navegar's assertion, their negligence claim did "not depend on whether" Navegar had a "duty . . . not to advertise" or "whether there is a causal link between Navegar's advertising and plaintiffs' injuries. [¶] From the start, plaintiffs have made clear their ordinary negligence claim is not based on Navegar's negligent advertising but rather its decision to 'make available for sale to the general public guns . . . which [it] knew or should have known have "no legitimate sporting or self-defense purpose" and which are "particularly well-adapted to a military-style assault on large numbers of people." ' [Citation.] Simply put, Navegar breached a duty of care by making the TEC-9 available to the general public," i.e., "by releasing the weapons for sale to the general public even though it knew or should have known that the TEC-9 was particularly attractive to criminals and particularly suited for mass killings." Plaintiffs concluded their argument regarding duty by asserting that "Navegar breached a legal duty to forebear [sic] distributing the TEC-9 to the general public given the likelihood that doing so would lead to the sort of violent criminal act that occurred at the 101 California Street Building."

As to causation, plaintiffs also argued that in light of their negligence theory, "whether Ferri actually saw or was influenced by any particular Navegar advertising is immaterial. [Fn. omitted.]" They explained: "[T]he ordinary negligence claim is directed to Navegar's conduct in making the TEC-9 available to the public. It is *that* unreasonable conduct that was a substantial factor in causing plaintiffs' injuries, not Navegar's marketing efforts." "Navegar's advertising is only material to the ordinary negligence claim in that it underscores that the criminal use of the weapon was foreseeable to Navegar. . . . [¶] *Plaintiffs are not alleging that Ferri was induced to purchase the TEC-DC9's or to commit the 101 massacre by any particular advertisements.* The significance of the advertisements is what they say about [Navegar's] knowledge of [its] market."

In reply, Navegar argued that section 1714.4 barred plaintiffs' "benefit-risk" theory of negligence, which plaintiffs premised on the allegation that TEC-9/DC9's "are used disproportionately to commit crimes and have no sporting or self-defense utility." Navegar also reasserted its argument that plaintiffs had no evidence Ferri saw or was affected by a Navegar advertisement.

The trial court granted Navegar's motion. As to common law negligence, it first observed that negligence liability does not exist absent a duty of care, and that plaintiffs claimed Navegar owed them a duty of care in part because the TEC-9/DC9 has "no legitimate use other than the killing and maiming of human beings, i.e., [its] potential for harm substantially outweighs any possible benefit to be derived from [it]." The trial court also observed that plaintiffs' negligence claim was not, as Navegar initially asserted, based on a duty not to advertise, but was "based on Navegar's decision to make available for sale to the general public assault-type guns which it knew or reasonably should have known have 'no legitimate sporting or self-defense purpose,' and which are 'particularly well-adapted to a military-style assault on large numbers of people.' " Emphasizing that Navegar had "*legally* manufactured and sold" the TEC-9/DC9's Ferri used, the trial court then held that California common law did not impose on Navegar a duty "not to manufacture or sell assault weapons." The court explained that "[i]n case after case, jurisdiction after jurisdiction, courts have refused to impose a duty upon manufacturers of firearms not to sell their products merely because of the potential misuse of the product by a third party. [Fn. omitted.]" In a footnote, the court rejected Navegar's reliance on section 1714.4, finding the statute inapplicable because plaintiffs were not asserting a *"products liability* theory."

As to negligence per se, the court found that plaintiffs' evidence failed to create a triable factual issue as to whether the advertisements influenced Ferri to purchase TEC-9/DC9's or to undertake his attack at 101 California Street. The court explained that "the links that plaintiffs seek to establish between advertisements and carnage amount to little more than guesswork." Finally, as to strict liability for an ultrahazardous activity, the court held that as a matter of law, the manufacture and distribution of a firearm, even an assault weapon, is not inherently dangerous.

Plaintiffs appealed the trial court's decision as to the common law negligence and ultrahazardous activity claims. The Court of Appeal unanimously affirmed as to ultrahazardous activity but, by a divided vote, reversed as to negligence. Regarding negligence, the majority first stated that because "the risk of harm from the criminal misuse of firearms is always present" in our

society, "the manufacturer and distributor of a legal and nondefective firearm may not be found negligent merely because it manufactured and/or distributed the weapon." Nevertheless, the majority concluded that Navegar had "a legal duty not to manufacture, market and distribute this weapon in a manner that increases the risk of harm inherent in the presence of handguns in society." The majority based imposition of this duty on "the strength of the evidence that the harm appellants suffered was or should have been foreseeable, the equally strong evidence Navegar's marketing increased the risk of such harm, and the evidence that there is no legitimate civilian use for the TEC-DC9." The majority also found triable factual issues as to whether the TEC-9/DC9 was "commonly used for illegal and injurious purposes, and whether [Navegar] knew or should have known that its targeted marketing of that product increased the likelihood of such harm." The majority also found triable factual issues as to causation. In reaching its conclusion, the majority agreed with the trial court that section 1714.4 was inapplicable because "this is not a 'products liability action.' "

The dissenting Court of Appeal justice disagreed with the majority on virtually all of these points, arguing that the majority substituted its own theory of duty for the theory plaintiffs had consistently urged, disregarded precedent declining to impose a duty to guard against third parties' criminal acts, ignored or mischaracterized other decisions declining to impose a duty not to make or sell a gun, and relied on speculation to support its holding on causation.

We granted Navegar's petition for review. Plaintiffs did not petition for review and have not otherwise asked us to consider the Court of Appeal's holding regarding their ultrahazardous activity claim. ■ Therefore, the only question before us is whether plaintiffs may proceed on their common law negligence claim.

## DISCUSSION

■ A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports. (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 612 [76 Cal.Rptr.2d 479, 957 P.2d 1313].) In the trial court, once a moving defendant has "shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established," the burden shifts to the plaintiff to show the existence of a triable issue; to meet that burden, the plaintiff "may not rely upon

the mere allegations or denials of its pleadings . . . but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . ." (Code Civ. Proc., § 437c, subd. (*o*)(2); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854-855 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

■ To prevail on their negligence claim, plaintiffs must show that Navegar owed them a legal duty, that it breached the duty, and that the breach was a proximate or legal cause of their injuries. (*Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1188 [91 Cal.Rptr.2d 35, 989 P.2d 121].) ■ The only elements we consider here are duty and causation.

■ "To say that someone owes another a duty of care ' "is a shorthand statement of a conclusion, rather than an aid to analysis in itself. . . . '[D]uty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." [Citation.]' [Citation.] '[L]egal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done.' [Citation.]" (*Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 933 [80 Cal.Rptr.2d 811, 968 P.2d 522].)

■ The existence and scope of duty are legal questions for the court. (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674 [25 Cal.Rptr.2d 137, 863 P.2d 207].) In determining those questions, we "begin always with the command of . . . section 1714, subdivision (a): 'Everyone is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person . . . .' " (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 885 [2 Cal.Rptr.2d 79, 820 P.2d 181].) There are, however, exceptions to this rule. Some are established by the Legislature through enactment of statutes. Others are judicially established where "clearly supported by public policy. [Citations.]" (*Rowland v. Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] (*Rowland*).) Before judicially establishing an exception based on public policy, courts consider a variety of factors; "the major ones are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved. [Citations.]" (*Id.* at p. 113.)

█ As we have explained, in the trial court, Navegar argued in effect that the Legislature, through section 1714.4, established an exception that applies in this case. Section 1714.4 provides: "(a) In a products liability action, no firearm or ammunition shall be deemed defective in design on the basis that the benefits of the product do not outweigh the risk of injury posed by its potential to cause serious injury, damage, or death when discharged. [¶] (b) For purposes of this section: [¶] (1) The potential of a firearm or ammunition to cause serious injury, damage, or death when discharged does not make the product defective in design. [¶] (2) Injuries or damages resulting from the discharge of a firearm or ammunition are not proximately caused by its potential to cause serious injury, damage, or death, but are proximately caused by the actual discharge of the product. [¶] (c) This section shall not affect a products liability cause of action based upon the improper selection of design alternatives. [¶] (d) This section is declaratory of existing law." Navegar argues that this statute, by establishing a state policy of exempting manufacturers of legal, nondefective firearms "from liability for their criminal use," bars plaintiffs' negligence claim.

Plaintiffs respond that section 1714.4 "has no application to this case because it is not a product[s] liability action." Plaintiffs assert that they "seek to hold Navegar liable for its negligent conduct, not for making a defective product," and that they "make no assertion that Navegar should be liable because the risks posed by the TEC-9 outweigh its benefits." More specifically, plaintiffs assert Navegar is liable because of the TEC-9/DC9's "negligent design, distribution, and marketing," or, as plaintiffs alternatively state, because Navegar "negligently designed, distributed, and marketed" the weapon.

█ In resolving these conflicting claims, we begin with basic tort principles. As Professors Prosser and Keeton explain, "Products liability is the name currently given to the area of the law involving the liability of those who supply goods or products for the use of others to purchasers, users, and bystanders for losses of various kinds resulting from so-called defects in those products." (Prosser & Keeton, Torts (5th ed. 1984) § 95, p. 677.) As relevant here, a plaintiff may seek recovery in a "products liability case" either "on the theory of strict liability in tort or on the theory of negligence." (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92] (*Jiminez*); see also *Pike v. Frank G. Hough Co.* (1970) 2 Cal.3d 465, 474 [85 Cal.Rptr. 629, 467 P.2d 229] (*Pike*) [" 'the negligence principle has been widely accepted in products liability cases' "]; *Lambert v. General Motors* (1998) 67 Cal.App.4th 1179 [79 Cal.Rptr.2d 657] (*Lambert*); Prosser, *Strict Liability to the Consumer* (1966) 18 Hastings L.J. 9, 10-21.) The rules of products liability "focus responsibility for defects, whether negligently or nonnegligently caused, on the

manufacturer of the completed product." (*Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 261 [37 Cal.Rptr. 896, 391 P.2d 168] (*Vandermark*).) Thus, under either a negligence or a strict liability theory of products liability, to recover from a manufacturer, a plaintiff must prove that a defect caused injury. (*Jiminez, supra,* 4 Cal.3d at p. 383; Prosser, *Strict Liability to the Consumer, supra,* 18 Hastings L.J. at pp. 50-51.) Under a negligence theory, a plaintiff must also prove "an additional element, namely, that the defect in the product was due to negligence of the defendant." (Prosser, *Strict Liability to the Consumer, supra,* 18 Hastings L.J. at pp. 50-51; see also *Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 128 [104 Cal.Rptr. 433, 501 P.2d 1153] [strict liability theory "dispense[s] with negligence as the basis of recovery in defective products cases"].)

■ A plaintiff may base a products liability claim on a defect in either the design or manufacture of a product. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 560 [34 Cal.Rptr.2d 607, 882 P.2d 298].) In a strict liability action based on defective design, "a product is defective . . . either (1) if the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if . . . the benefits of the challenged design do not outweigh the risk of danger inherent in such design." (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 418 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1] (*Barker*).) In applying the latter standard—which we will refer to as a risk/benefit test—"a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." (*Id.* at p. 431.)

■ Similarly, in a products liability action based on negligence in the design of a product "placed on the market," the test of negligent design "involves a balancing of the likelihood of harm to be expected from a machine with a given design and the gravity of harm if it happens against the burden of the precaution which would be effective to avoid the harm." (*Pike, supra,* 2 Cal.3d at p. 470.) As Professors Prosser and Keeton explain in the Products Liability chapter of their treatise: "A manufacturer or other seller can be negligent in marketing a product because of the way it was designed. In short, even if a seller had done all that he could reasonably have done to warn about a risk or hazard related to the way a product was designed, it could be that a reasonable person would conclude that the magnitude of the reasonably foreseeable harm as designed outweighed the utility of the product as so designed." (Prosser & Keeton, Torts, *supra,* § 96, p. 688.)

Thus, "most of the evidentiary matters" relevant to applying the risk/benefit test in strict liability cases "are similar to the issues typically presented in a negligent design case." (*Barker, supra,* 20 Cal.3d at p. 431.) This similarity is not surprising, because to say that a product was " 'negligently designed' " is to say it " 'was defective, for purposes of establishing liability under a theory of negligence.' [Citation.]" (*Lambert, supra,* 67 Cal.App.4th at p. 1184.) This similarity also is not accidental; over the years, we have incorporated a number of negligence principles into the strict liability doctrine, including *Barker*'s risk/benefit test. (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1005-1006 [281 Cal.Rptr. 528, 810 P.2d 549].)

Under these principles, we reject plaintiffs' argument that section 1714.4 is inapplicable because this case "is not a product[s] liability action." As noted, the basis of their argument, which the dissent essentially adopts (see dis. opn. of Werdegar, J., *post,* at pp. 493-494, 513-517), is that they seek to hold Navegar liable for "negligent conduct, not for making a defective product," and that they "make no assertion that Navegar should be liable because the risks posed by the TEC-9 outweigh its benefits." However, that plaintiffs rely on "negligent conduct" is not determinative; as we have explained, a plaintiff may, in fact, premise a "products liability case" on the "negligence of the defendant." (*Jiminez, supra,* 4 Cal.3d at p. 383.) As our discussion also demonstrates, in asserting that the TEC-9/DC9 had a "negligent design" and that Navegar "negligently designed" it, plaintiffs have in fact alleged that the TEC-9/DC9 is, in the words of section 1714.4, subdivision (a), "defective in design."

Moreover, contrary to the assertion of plaintiffs and the dissent (see dis. opn. of Werdegar, J., *post,* at p. 515), the record demonstrates that plaintiffs do, in fact, seek to hold Navegar liable precisely because, as the trial court stated, the TEC-9/DC9's "potential for harm substantially outweighs any possible benefit to be derived from [it]." In their brief, plaintiffs assert that Navegar is liable because it "designed and widely distributed a weapon uniquely suited for mass killing and lacking legitimate civilian uses." Plaintiffs further assert: "While the record contains abundant evidence of the disproportionately criminal use of the TEC-9, it is utterly 'bereft of any persuasive evidence that it is suitable or commonly employed for any other civilian use.' [Citation.] Underscoring what the evidence here confirms, the California Legislature enacted the AWCA to ban the gun. It expressly declared [in Penal Code section 12275.5] that TEC-9's and other assault weapons are particularly attractive for violent criminal use, 'serve no . . . sporting purpose for honest citizens,' and the proliferation of these guns 'poses a threat to the health, safety and security of all citizens of this state.' "

Thus, plaintiffs argue, "[t]he Legislature has restricted the [TEC-9] based upon a finding that [it] has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is outweighed by the danger that it can be used to kill or injure human beings." As our previous discussion shows, these allegations squarely fit within the risk/utility test for defective design that applies in a products liability action under both negligence and strict liability theories. Using the words of the risk/utility test for both products liability theories, plaintiffs essentially allege, argue and hope to prove that the TEC-9/DC9 is defective in design. Thus, despite the contrary view of plaintiffs and the dissent (dis. opn. of Werdegar, J., *post*, at pp. 492-493, 515), this is a products liability action based on negligence, which asserts that the TEC-9/DC9 was defective in design because the risks of making it available to the general public outweighed the benefits of that conduct, and that defendants knew or should have known this fact. Plaintiffs may not avoid this conclusion, or the legislative policy section 1714.4 reflects, simply by declining to use the word "defect" or "defective."

Nor, contrary to the view of plaintiffs and the dissent, may plaintiffs avoid section 1714.4 simply by reformulating their claim as one for negligent distribution to the general public. As our previous discussion demonstrates, implicit in both the negligence and strict liability theories of products liability is that the defendant manufacturer was "engaged in the business of distributing goods to the public." (*Vandermark, supra*, 61 Cal.2d at p. 262; see also *Pike, supra*, 2 Cal.3d at p. 470 [defining manufacturer's duty in designing products "placed on the market"].) Thus, plaintiffs' allegation that Navegar made the TEC-9/DC9 available to the general public adds nothing to the standard products liability action. Plaintiffs' claim that Navegar's decision to distribute the TEC-9/DC9 to the general public was negligent given the weapon's particular design features is therefore simply a reformulated claim that the weapon, as designed, fails the risk/benefit test. The same is true of the dissent's negligence theory, which evaluates Navegar's conduct based on a weighing of the risks (known attractiveness to violent users) and benefits (lack of legitimate civilian use) of the TEC-9/DC9 in light of its *design*. (Dis. opn. of Werdegar, J., *post*, at pp. 493-494, 515.) This conclusion is fully consistent with the "tendency among courts," as reported in one of the law review articles the dissent cites (dis. opn. of Werdegar, J., *post*, at p. 513, fn. 11), "to view" claims of negligent distribution to the general public "as being essentially design defect claims in disguise . . . ." (Lytton, *Halberstam v. Daniel and the Uncertain Future of Negligent Marketing Claims Against Firearms Manufacturers* (1998) 64 Brook. L.Rev. 681, 684; see also Prosser & Keeton, Torts, *supra*, § 96, p. 688 [products liability includes manufacturer's negligence "in marketing a product because of the

way it was designed" where "a reasonable person would conclude that the magnitude of the reasonably foreseeable harm as designed outweighed the utility of the product as so designed"].) We therefore reject the view of plaintiffs and the dissent that plaintiffs' claim for negligent distribution to the general public falls outside of section 1714.4's scope.

The relevant legislative history supports our conclusion that section 1714.4 bars plaintiffs' negligence claim. The Legislature enacted section 1714.4 in 1983 by passing Assembly Bill No. 75 (1983-1984 Reg. Sess.) (Assembly Bill No. 75). The bill originated as a legislative response to the filing of numerous " 'product liability' lawsuits by victims of handguns who [were] seeking damages from firearms manufacturers and dealers." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 75 (1983-1984 Reg. Sess.), as amended May 11, 1983, p. 1.) According to an analysis of the Senate Judiciary Committee (Senate Analysis), the plaintiffs in these cases argued that the firearms were " 'inherently defective products because the danger posed by such items f[a]r outweighs any social benefits.' " (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 75 (1983-1984 Reg. Sess.) as amended May 25, 1983, p. 7.) More specifically, they asserted that "the availability of 'Saturday Night Special' handguns to the general public causes widespread damage and severe harm without conferring any substantial social benefit." (*Id.* at p. 9.) The Senate Analysis described the bill's "purpose" as follows: (1) "to protect manufacturers and sellers of firearms from being held liable in tort for selling or furnishing a firearm that was used to cause an injury or death"; (2) "to preclude courts from using products liability theories to hold firearm manufacturers and dealers civilly liable to victims of firearms usage"; (3) "to prevent the courts from extending products liability laws to hold a supplier of a firearm liable in tort to persons injured by use of the weapon"; and (3) "to 'stop at birth' the notion that manufacturers and dealers are liable in products liability to victims of handgun usage." (*Id.* at pp. 2, 3, 7.) It would obviously frustrate these legislative purposes to permit plaintiffs to proceed with their claim that Navegar is liable because the risks of selling the TEC-9/DC9 to the general public outweighed the benefits.

According to plaintiffs and the dissent (dis. opn. of Werdegar, J., *post*, at pp. 515-516), revisions to the original language of Assembly Bill No. 75 during the process that led to section 1714.4's enactment confirm the statute's inapplicability. As introduced, Assembly Bill No. 75 proposed adding a subdivision to section 1714 that stated in part: "The furnishing of firearms or ammunition, with or without consideration, is not the proximate cause of injuries resulting from the use of firearms or ammunition, but rather the wrongful misuse of firearms or ammunition is the proximate cause of

injuries inflicted upon another by the use or a firearm or ammunition." (Assem. Bill No. 75 (1983-1984 Reg. Sess.) as introduced Dec. 8, 1982.) Plaintiffs argue that this language, which would have established "a broader exemption," was "amended during the legislative process to make clear that it only limited the application of certain product liability theories and did not create any immunity from negligence liability."

For several reasons, we disagree. First, plaintiffs incorrectly assume that an action based on negligence is necessarily not a products liability action. Plaintiffs correctly recognize that, according to section 1714.4's legislative history, the Legislature intended to bar not just one theory of products liability, but to bar certain "products liability theories." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 75 (1983-1984 Reg. Sess.) as amended May 25, 1983, p. 2.) However, they fail to recognize that, as we have explained, negligence is one of the theories on which a products liability action may be based. As we have also explained, in products liability actions based on a design defect, both the negligence theory and the strict liability theory involve a risk/benefit analysis (unless the plaintiff asserts a strict liability claim based on the consumer expectation theory). It is logical to conclude that these were the "products liability theories" that, according to the Senate Analysis, the Legislature intended to foreclose in passing section 1714.4. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 75 (1983-1984 Reg. Sess.) as amended May 25, 1983, p. 2.)

Second, the legislative history suggests the Legislature revised the bill during the enactment process to preserve claims far different from the claim plaintiffs assert. The Senate Analysis noted concern that the original language would preclude claims for "negligent entrustment" and other, unidentified "form[s] of negligent furnishing." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 75 (1983-1984 Reg. Sess.) as amended May 25, 1983, p. 3.) Specifically, "opponents of th[e] bill claim[ed] that Assembly Bill No. 75 would eliminate any responsibility for the consequences when a merchant sells a firearm to a customer who is obviously drunk or insane or who is a minor." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 75 (1983-1984 Reg. Sess.) as amended May 5, 1983, p. 3.) As enacted, section 1714.4 may not affect such claims. However, as plaintiffs asserted in the trial court, they "have not brought a negligent entrustment claim . . . . [T]heir negligence claim is based on [Navegar's] decision to make available to the general public (not a specific individual) [its] highly dangerous products." (Cf. *Coulter v. Superior Court* (1978) 21 Cal.3d 144, 147 [145 Cal.Rptr. 534, 577 P.2d 669] [furnishing alcohol to an "obviously intoxicated" person]; *Jacoves v. United Merchandising Corp.* (1992) 9 Cal.App.4th 88, 116 [11 Cal.Rptr.2d 468] [discussing liability for "negligent entrustment of a dangerous instrumentality to a person who the supplier knows, or has reason to know, is a danger to himself or herself, or others"].)

To the extent plaintiffs argue the Legislature revised the original language to preserve some other, unidentified and undefined form of "negligent furnishing," we cannot properly conclude, as does the dissent, that the Legislature intended to preserve a claim based on a manufacturer's alleged negligence in "selling" its firearm "to the general public." (Dis. opn. of Werdegar, J., *post*, at p. 515.) That interpretation would preserve precisely the type of lawsuit that, according to the legislative history, the Legislature intended to foreclose, in which the plaintiffs "asserted that the availability of 'Saturday Night Special' handguns *to the general public* cause[d] widespread damage and severe harm without conferring any substantial social benefit." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 75 (1983-1984 Reg. Sess.) as amended May 25, 1983, p. 9, italics added.) It would also render section 1714.4 useless; in every case involving injuries from firearms, the plaintiffs could avoid the statute simply by adding to their risk/utility analysis the allegation that the manufacturer was negligent in making the weapon available to the general public. Finally, to address the concern about negligent furnishing, the Senate Analysis proposed limiting the statute "to products liability." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 75 (1983-1984 Reg. Sess.) as amended May 25, 1983, p. 3.) That, of course, is precisely what the Legislature did. As we have already explained, implicit in the doctrine of products liability is that the defendant manufacturer distributed goods to the public, so plaintiffs' allegation that Navegar made the TEC-9/DC9 available to the general public adds nothing to the standard products liability action. Accordingly, any revisions the Legislature made to preserve "negligent entrustment" or "negligent furnishing" claims did not render section 1714.4 inapplicable to plaintiffs' claim.

The Senate Analysis also noted concern that the original language would preclude liability where the product was "unsafe because the design failed to incorporate some safety measures . . . ." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 75 (1983-1984 Reg. Sess.) as amended May 25, 1983, p. 6.) This concern perhaps led to addition of subdivision (c) of section 1714.4, which provides that the statute "shall not affect a products liability cause of action based upon the improper selection of design alternatives." However, plaintiffs have disavowed any claim under this subdivision. They do not argue that the TEC-9/DC9 was unsafe because it failed to have certain safety measures, or that Navegar should have designed the TEC-9/DC9 in some other way. They claim only that Navegar should not have made it available to the general public because, given its particular features, the risks that someone would use it criminally as Ferri did outweighed its nonexistent legitimate benefits. Construing the exception in subdivision (c) to encompass this claim would eviscerate section 1714.4's primary purpose.

The Senate Analysis also noted concern the original language would foreclose strict liability based on *Barker*'s consumer expectation test for

product defect, which is an alternative to the risk/benefit test. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 75 (1983-1984 Reg. Sess.) as amended May 25, 1983, p. 7; see also *Barker, supra*, 20 Cal.3d at p. 416.) The Senate Analysis explained that the lawsuits the proposed legislation intended to foreclose were "not based on the consumer expectancy test, which is generally used in actions involving accidental injury, and it would appear unnecessary, if not undesirable, to require proof of a malfunction in cases where the product failed to perform as safely as expected." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 75 (1983-1984 Reg. Sess.) as amended May 25, 1983, p. 7.) This concern may explain why the Legislature amended the bill's language to focus precisely on the risk/benefit test for a product defect. Notably, when it made this change, the Legislature did not use the term "strict liability," which on its face would not have included use of the risk/benefit analysis in a negligence action. Instead, it referred more broadly to "products liability actions" (§ 1714.4, subd. (a)), which, as we have explained, includes *both* negligence and strict liability theories of recovery for a design defect based on a risk/benefit analysis (unless the plaintiff asserts only a strict liability claim based on the consumer expectation theory). In summary, the revisions that occurred during section 1714.4's enactment process do not persuade us the Legislature either intended to exclude or in fact excluded plaintiffs' negligence claim from the statute's reach.[4]

In any event, even were plaintiffs correct that section 1714.4 applies by its terms only to the strict liability theory of products liability, given the overlap between the strict liability and negligence theories of products liability, we would find that the policy the statute establishes bars plaintiffs' claim. As we have explained, under both theories, a plaintiff must show that a product defect caused injury. (*Jiminez, supra*, 4 Cal.3d at p. 383.) ■ However, "[s]trict products liability differs from negligence in one key respect: it obviates the need for a plaintiff to show a manufacturer knew or should have known of the risk posed by his product—i.e., whether the manufacturer acted reasonably." (*Kearl v. Lederle Laboratories* (1985) 172 Cal.App.3d 812, 822 [218 Cal.Rptr. 453].) ■ Plaintiffs' counsel recognized this overlap at oral argument, explaining that by proceeding on a negligence theory, plaintiffs "are assuming an additional burden here; that is the burden

---

[4]The Senate Analysis also refers to concern the original language might preclude liability based on "marketing circumstances," and specifically mentions marketing a product without an adequate warning. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 75 (1983-1984 Reg. Sess.) as amended May 25, 1983, p. 8.) Plaintiffs do not assert a failure-to-warn claim. We have already considered "marketing circumstances" to the extent, if any, this term may be construed as referring simply to a manufacturer's decision to make a firearm available to the general public. To the extent it may be construed as referring to advertising, we discuss that issue later in this opinion.

of showing fault. And [plaintiffs are] not contending that there isn't some element of balancing risks versus benefits in a fault-based case. That kind of weighing is inherent in the *Rowland v. Christian* factors. The point is that the weighing has to rise to the level that the risks so outweigh the benefits, taking into account all the other *Rowland* factors, that it can be said that the activity of the defendant violates a standard of reasonable care." We find no indication that in enacting section 1714.4, the Legislature intended to prohibit a jury from weighing the risks and benefits of a firearm in considering strict liability while allowing it to perform the same task in a negligence action to determine whether the risks so outweighed the benefits that the manufacturer breached a duty of care.

The absence of any such indication is not surprising, given that the availability of such negligence liability would effectively render section 1714.4 useless. As the Court of Appeal majority observed, "the risk of harm from the criminal misuse of firearms is always present in a society such as ours, in which the presence of firearms is fairly widespread and many individuals possess the capacity to criminally misuse them." Thus, virtually every person suing for injuries from firearm use could offer evidence the manufacturer knew or should have known the risk of making its firearm available to the public outweighed the benefits of that conduct, and could therefore raise a triable issue of fact for the jury. In each of these cases, the jury would be asked to do precisely what section 1714.4 prohibits: weigh the risks and benefits of a particular firearm. The result would be to resurrect the very type of lawsuit the Legislature passed section 1714.4 to foreclose, in which the plaintiffs "asserted that the availability of 'Saturday Night Special' handguns to the general public cause[d] widespread damage and severe harm without conferring any substantial social benefit." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 75 (1983-1984 Reg. Sess.) as amended May 25, 1983, p. 9.) Because the Legislature, in section 1714.4, has precluded a weighing of the risks and benefits of selling a firearm to the general public in determining whether the firearm is defective, we conclude that neither a court nor a jury may undertake this same task simply because a plaintiff alleges and offers evidence the manufacturer knew or should have known the risks outweighed the benefits.[5]

In finding section 1714.4 inapplicable, the Court of Appeal majority relied in part on policy statements in the AWCA. According to the Court of Appeal majority, "[t]he statements in the AWCA that the TEC-9, like other assault weapons, 'has such a high rate of fire and capacity for firepower that its

---

[5]Given our conclusion that section 1714.4 bars plaintiffs' negligence claim, we express no opinion regarding whether, in light of the *Rowland* factors, Navegar would otherwise have owed plaintiffs a duty of care.

function as a legitimate sports or recreational firearm is substantially out-weighed by the danger that it can be used to kill and injure human beings' (Pen. Code,. § 12275.5), and that such weapons 'are particularly dangerous in the hands of criminals and serve no necessary hunting or sporting purpose for honest citizens' (Stats. 1989, ch. 19, § 5, pp. 69-70), amount to a *legislative* risk/benefit analysis. Nothing in section 1714.4 suggests that the judiciary must blind itself to such a legislative declaration when it reflects a policy relevant to determination of the duty to exercise due care in a negligence action."

Unlike the Court of Appeal, we find that the AWCA does not render section 1714.4 inapplicable. The Court of Appeal majority effectively read the AWCA policy statements as an implied repeal of section 1714.4 as it applies to any of the firearms the AWCA specifies. ▮ However, " '[a]ll presumptions are against a repeal by implication. [Citations.]' [Citation.] Absent an express declaration of legislative intent, we will find an implied repeal 'only when there is no rational basis for harmonizing the two poten-tially conflicting statutes [citation], and the statutes are "irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation." ' [Citation.]" (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476-477 [66 Cal.Rptr.2d 319, 940 P.2d 906].) ▮ The AWCA contains no express declaration of legislative intent to repeal section 1714.4 or to affect it in any way. Nor does anything in the AWCA's legislative history suggest that one of its purposes was to establish an exception to section 1714.4 for the listed weapons. Nor are the statutes so inconsistent that they cannot concurrently operate; that the AWCA imposes restrictions and *criminal* penalties based on a legislative assessment of risks and benefits is not irreconcilable with prohibiting civil liability based on such an assessment. We would read too much into the AWCA if we found in it the expression of a state policy that manufacturers of specified assault weapons may be *civilly* liable based on an assessment of the risks and benefits of making their product available to the general public, at least when they comply with the AWCA.[6]

Finally, we also conclude that the evidence in the record regarding Navegar's promotional activities and the literature it distributed with the TEC-9/DC9 does not save plaintiffs' negligence claim. As we have previ-ously explained, in opposing Navegar's summary judgment motion, plain-tiffs insisted that "their ordinary negligence claim" was not "directed to" or "based on Navegar's negligent advertising but rather its decision to make [the TEC-9/DC9] available for sale to the general public . . . ." Thus, they

---

[6]Plaintiffs' negligence per se claim based on Navegar's alleged violation of the AWCA is not before us.

argued, their claim depends solely on "a legal duty to forebear [*sic*] distributing the TEC-9 to the general public," and not on a "duty . . . not to advertise." Plaintiffs also insisted that it was Navegar's "unreasonable conduct" in "making the TEC-9 available to the public . . . that was a substantial factor in causing [their] injuries, not Navegar's marketing efforts." Thus, they maintained, "whether Ferri actually saw or was influenced by any particular Navegar advertising is immaterial. [Fn. omitted.]" Plaintiffs further explained that under their negligence theory, "Navegar's advertising is only material to the ordinary negligence claim in that it underscores that the criminal use of the weapon was foreseeable to Navegar. . . . [¶] *Plaintiffs are not alleging that Ferri was induced to purchase the TEC-DC9's or to commit the 101 massacre by any particular advertisements.* The significance of the advertisements is what they say about [Navegar's] knowledge of [its] market."

Plaintiffs have adhered to this position on appeal. In their briefs in the Court of Appeal, they explained that their "ordinary negligence claim has never hinged on proof that Ferri's 101 California Street massacre was caused by him seeing or being influenced by a Navegar advertisement. [Fn. omitted.] Rather, causation flows from Navegar's conduct in making the high-firepower TEC-9 available to the public. It is that unreasonable conduct that was a substantial factor in causing [plaintiffs'] injuries, not Navegar's advertising per se. [Fn. omitted.]" Plaintiffs also asserted in the Court of Appeal that Navegar's advertising was relevant only to show that Navegar "foresaw that the TEC-9 would be used by persons like Ferri to commit violent acts."[7] Consistently, in their brief to this court, plaintiffs "disavow reliance on [the] 'theory of negligent marketing per se,' " noting that they merely " 'place [Navegar's] marketing within the context of the overall duty they assert Navegar breached.' " Given these assertions, it would be inappropriate to overturn the trial court's decision on a "negligent marketing" theory. (See *North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 29 [21 Cal.Rptr.2d 104].)

In any event, the evidence in the record fails to raise a triable factual issue as to whether Navegar's advertising and literature were substantial factors in

---

[7]Plaintiffs' counsel adhered to this position at oral argument in the Court of Appeal. He confirmed that plaintiffs' negligence claim was not based on negligent advertising, but on Navegar's decision to sell the TEC-9 to the general public. When asked what acts caused plaintiffs' injuries, he responded: "selling to the general public a weapon designed precisely for the use it was put to at 101 California Street." He reiterated that the advertising was relevant as "evidence of the foreseeability that the basic conduct by this company would lead to this kind of tragedy." Finally, he agreed with the court's observation that plaintiffs were not alleging the advertising induced Ferri to commit the assault. He explained that plaintiffs instead were claiming that the "military features" of the TEC-9/DC9 "were important to" Ferri and were a substantial factor in emboldening him to commit the kind of attack he committed.

causing plaintiffs' injuries. Regarding this question, plaintiffs' counsel asserted at oral argument that "Navegar's liability does not depend on its telling the public, here's a great gun to commit a crime," but on its "communicat[ing] a message that people who want above all else in their weapons firepower, the capacity to shoot many, many rounds without the need to reload, and to use that gun in a combat fashion, this is the gun for you." Similarly, in their causation argument in their brief, plaintiffs focus on "Navegar's promotion of the TEC-9 and glorification of its capabilities." However, in light of section 1714.4, plaintiffs may not base negligence liability on materials that simply describe the physical and functional features of the TEC-9/DC9 (i.e., lightweight, inexpensive, high-capacity, nine-millimeter) or its manner of operation. Because section 1714.4 precludes recovery on the theory that, given the TEC-9/DC9's particular features, Navegar should not have made it available to the general public, the statute necessarily also precludes recovery for simply telling the public and purchasers about those features.

To the extent plaintiffs rely on allegedly more inflammatory aspects of Navegar's advertising, they fail to raise a triable factual issue regarding causation. For example, they offer no evidence, direct or circumstantial, that Ferri ever saw the promotional materials sent to dealers, which used the phrase "tough as your toughest customer," or the early version of the TEC-KOTE product brochure description, which promised "excellent resistance to fingerprints." Moreover, plaintiffs do not dispute that: (1) San Francisco police inspectors did "not recall" finding "any TEC-DC9 magazine advertisement in Ferri's apartment" and found "no evidence" that any advertisement caused Ferri to travel to Nevada to purchase the TEC-DC9's; (2) "[t]here is otherwise no Navegar magazine advertisement in the possession of the City and County of San Francisco as evidence collected in the 101 California Street shootings"; (3) the salesperson at the Pawn & Gun Shop in Henderson, Nevada, where Ferri bought the used TEC-9, "never" saw Ferri in possession of any advertisement or literature for the TEC-9 or TEC-DC9, and never heard Ferri mention he had seen any advertisement for the TEC-9 or TEC-DC9; (4) when Ferri bought the first new TEC-9/DC9, he had no firearms advertisement or other type of literature in his possession and did not ask for the TEC-9/DC9 by name; and (5) when Ferri bought the second new TEC-9/DC9, he indicated he already owned another TEC-9/DC9. Plaintiffs have failed to produce, or show that they will be able to produce at trial, substantial evidence "that Navegar's marketing style was 'a factor' in" Ferri's conduct. (*Bubalo v. Navegar, Inc.* (N.D.Ill., June 13, 1997, No. 96 C 3664) 1997 WL 337218, at p. *9; see also *Casillas v. Auto-Ordnance Corp.* (N.D.Cal., May 17, 1996, No. C 95-3601 FMS) 1996 WL 276830, at p. *3 [granting summary judgment for gun manufacturer on

negligent marketing claim in part because no evidence was presented the defendant's advertisements "were seen by [the assailant], or were somehow the cause of [the assailant's] violent behavior"]; Lytton, *Halberstam v. Daniel and the Uncertain Future of Negligent Marketing Claims Against Firearms Manufacturers, supra,* 64 Brook. L.Rev. 681, 696-698 [jury returned special defense verdict on causation in negligent marketing case where assailant testified he never saw the defendants' advertising and their marketing conduct did not otherwise influence him].)

In arguing to the contrary, plaintiffs cite evidence that Ferri went to Nevada, where the TEC-9/DC9 was available, to buy guns for his planned attack and that the two stores where he bought TEC-9/DC9's had Las Vegas Yellow Pages advertisements picturing, among other guns, assault weapons. Although this evidence does tend to show Ferri sought to purchase high-firepower guns, it does not tend to show Ferri went to Nevada or the stores in search of a TEC-9/DC9 or other assault pistol *in response to Navegar's marketing efforts.* The existence of various high-firepower rifles and pistols would have been so widely known from other sources (especially to a reader of gun magazines as, apparently, Ferri was) as to render unjustified any inference that Navegar's marketing efforts were a substantial factor in motivating Ferri's decision to seek such a gun. Thus, we agree with the trial court that "the links plaintiffs seek to establish between advertisements and carnage amount to little more than guesswork." Although evidence of causation may be circumstantial, "it must be substantial"; it is insufficient where, as here, it leaves the question of causation "in the realm of mere speculation and conjecture . . . ." (*Showalter v. Western Pacific R. R. Co.* (1940) 16 Cal.2d 460, 471 [106 P.2d 895].)

In finding a triable factual issue regarding causation, the Court of Appeal majority relied heavily on *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059] (*Stevens*).[8] There, the plaintiffs were the survivors of a woman who died from ingesting Chloromycetin, a toxic antibiotic. At trial, they succeeded on their claim against the drug's manufacturer, Parke, Davis & Company (Parke, Davis), for negligent "overpromotion" of the drug that caused its prescription in inappropriate cases. (*Id.* at pp. 57-59.) The prescribing physician, Dr. Beland, testified he

---

[8]The Court of Appeal also relied on the declaration of Dr. J. Reid Meloy, a forensic psychologist, who opined that the firepower, other technical capabilities and military appearance of the TEC-9/DC9 likely "emboldened" Ferri to undertake his assault. Although Meloy discussed Navegar's advertising of the TEC-9/DC9, he was careful to note that he did not know whether Ferri had seen any of it, and he did not opine that the advertising, or any other aspect of Navegar's *marketing*, contributed to Ferri's actions. Meloy's declaration thus does not create a triable factual issue as to a causal connection between plaintiffs' injuries and Navegar's marketing of the TEC-9/DC9.

had received visits from drug salesmen and read medical journals in which Parke, Davis advertised the drug, but he "could not remember specific instances in which he received any information, promotional or otherwise, directly from Parke, Davis . . . ." (*Id.* at p. 68, fn. 16.) Nevertheless, we found the evidence of causation sufficient to support the verdict: "Like many others of the profession, [Dr. Beland] had been exposed to the promotional tactics employed by Parke, Davis. It is reasonable to assume that the company's efforts consciously or subconsciously influenced him. In addition, plaintiff introduced expert testimony by a physician that the advertising and promotion of the drug 'played a role' in inducing physicians to prescribe it when it was not sound practice to do so. The jury could reasonably infer from the above circumstantial evidence that Dr. Beland was induced by the manufacturer's activities to prescribe the drug and were entitled to reject Dr. Beland's testimony to the contrary. [Citation.]" (*Id.* at p. 68, fns. omitted.)

Unlike the Court of Appeal, we find the facts here materially distinguishable from those in *Stevens.* The physician in *Stevens* prescribed the drug Chloromycetin *by name.* The likely sources of any information he had specifically about Chloromycetin were the manufacturer's advertising and visits from its sales representatives, and the evidence showed these sources negligently omitted or " 'water[ed] down' " warnings of the drug's dangers. (*Stevens, supra,* 9 Cal.3d at p. 66.) From these facts, a jury could reasonably infer the drug maker's negligent marketing had influenced the physician's prescription choice. Here, in contrast, Ferri never asked for a TEC-9/DC9, or any other Intratec firearm, by name. Before purchasing any gun, he made a number of information-gathering visits to the Pawn & Gun Shop, during which he examined numerous firearms and asked questions of the sales staff. From this circumstantial evidence, a jury could *not* reasonably infer the information about the TEC-9/DC9 that ultimately influenced Ferri to choose it derived from Navegar's magazine advertisements or catalogs. Thus, even had plaintiffs asserted a negligence theory based on Navegar's TEC-9/DC9 advertising and literature, the record fails to raise a triable factual issue regarding causation.[9]

Accordingly, we conclude the trial court properly granted Navegar summary judgment. In reaching this conclusion, we are not insensitive to the terrible tragedy that occurred on July 1, 1993, or the devastating effect of Ferri's rampage on his victims and their loved ones. But, in section 1714.4, the Legislature has set California's public policy regarding a gun manufacturer's liability under these circumstances. Given that public policy, plaintiffs may not proceed with their negligence claim.

---

[9]Given this conclusion, we express no opinion as to whether a "negligent advertising" theory would otherwise be legally viable on a different evidentiary record.

DISPOSITION

The judgment of the Court of Appeal is reversed with directions to affirm the summary judgment for defendant.

George, C. J., Kennard, J., Baxter, J., and Brown, J., concurred.

**KENNARD, J.,** Concurring.—I join in the majority opinion.

One cannot read the facts of this case without feeling the utmost sympathy for the families of the eight persons killed and for the six others wounded by Gian Luigi Ferri, who in his rampage used two TEC-9 assault weapons manufactured by defendant Navegar, Inc. And one feels dismay at the insensitivity of defendant's marketing director, who had told the New York Times that he welcomed damning criticism by law enforcement of the TEC-9, a· popular weapon with criminals. He explained: "I'm kind of flattered. It just has that advertising tingle to it. Hey, it's talked about, it's read about, the media write about it. That generates more sales for me."

Whatever personal emotions and personal views members of this court may have in this tragic case, those feelings must be put aside in resolving the narrow legal question decided here. The issue requires an interpretation of subdivision (a) of Civil Code section 1714.4, which provides that in an action for products liability "no firearm . . . shall be deemed defective in design on the basis that the benefits of the product do not outweigh the risk of injury posed by its potential to cause serious injury, damage, or death when discharged." I agree with the majority that plaintiffs' cause of action for "common law negligence" falls within that provision. As the majority explains, in enacting that provision, the Legislature intended to bar the kind of action that plaintiffs here brought against Navegar.

Enacting statutes is within the province of the Legislature. The task of the judiciary is to interpret those statutes by ascertaining and effectuating the Legislature's intent. It is not for us to question the wisdom of the Legislature's considered judgments. (*People v. Loeun* (1997) 17 Cal.4th 1, 9 [69 Cal.Rptr.2d 776, 947 P.2d 1313]; *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 909 [66 Cal.Rptr.2d 888, 941 P.2d 1157].) Any change in Civil Code section 1714.4 must come from the Legislature.

**WERDEGAR, J.**—I respectfully dissent. I cannot accept the majority's conclusion that plaintiffs are statutorily barred from suing the maker of the semiautomatic assault weapon used to massacre the victims in this case. Neither the letter of Civil Code section 1714.4 nor the legislative policy it embodies bars this action for negligence in the marketing of a firearm.

Complex though some of the issues in this case are, the statutory question addressed by the majority can be resolved simply. Civil Code section 1714.4 bars product liability actions against gunmakers based on the risk-benefit theory of product defect. The legislative policy behind the statute might, at most, be deemed also to encompass negligence claims that are substantially identical to risk-benefit product defect claims. Plaintiffs' claim is neither. Plaintiffs' claim of negligence is, at bottom, that defendant Navegar, Inc. (Navegar) acted without due care in distributing the TEC-9/DC9—a semi-automatic handgun combining portability and ease of use with an extraordinary rapidity and capacity for lethal firepower—to the general civilian public rather than restricting its sales to police and military units that might have a legitimate call for such a military-style assault pistol. Plaintiffs do *not* claim that the TEC-9/DC9 is defective; nor do they even claim that defendant acted negligently *simply by making* the TEC-9/DC9. Plaintiffs allege negligence, rather, in Navegar's *selling that firearm on the general civilian market knowing it would attract purchasers likely to misuse it*, rather than restricting sales to buyers with a lawful use for the tools of assaultive violence, such as police and military units. This theory of negligence, resting on the allegation that particular marketing choices by Navegar were imprudent, is not substantially identical to a claim of product defect and thus is within neither the letter nor the spirit of Civil Code section 1714.4.

The majority insists plaintiffs' negligent distribution claim is really one of product defect because plaintiffs' claim depends, in part, on certain of the TEC-9/DC9's features and technical characteristics. But not all claims involving a product's features are claims of defect. Here, the TEC-9/DC9's characteristics are important not to show defect but to demonstrate the foreseeability of injury from, and the consequent imprudence of, distributing this gun in a way that allows its purchase by violent criminals and the mentally deranged. Navegar's conduct was allegedly negligent not because its gun was defective but because, in light of the gun's known attractiveness to violent users and the lack of a compelling need for its availability in the civilian market, a reasonably careful distributor would have restricted sales to groups unlikely to misuse the firearm. Civil Code section 1714.4 simply does not address such a negligent distribution claim.

Before considering Civil Code section 1714.4, I address, and reject, Navegar's more fundamental claim that it should bear no liability for its allegedly negligent marketing because at the time it made and sold the weapons at issue their manufacture and distribution outside the state was not illegal and it had no special relationship with the massacre's perpetrator. A gunmaker, no less than anyone else manufacturing and distributing a consumer product, is subject to the general duty of due care (Civ. Code, § 1714,

subd. (a)) toward those foreseeably affected by its business activities. While this court has created exemptions from the general rule of liability for foreseeable injuries caused by one's negligent conduct in circumstances where recognizing a duty of due care running from the defendant to the plaintiff would result in unwarranted interference with activities valuable to the community, or otherwise contravene the state's established public policy (see *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472-475 [63 Cal.Rptr.2d 291, 936 P.2d 70]), no such policy justifies an exemption for the manufacture and distribution of semiautomatic pistols restricted under California's Roberti-Roos Assault Weapons Control Act of 1989 (AWCA). (See Pen. Code, §§ 12275.5, 12276.)

As will be seen, moreover, the generalized foreseeability required for existence of a duty was also present here. Violent criminal use of the TEC-9/DC9 was highly predictable to a person in the circumstances of Navegar's management. Indeed, the evidence presented on summary judgment in this case demonstrated that Navegar's management not only should have known, but actually did know, that the technical and aesthetic characteristics of the TEC-9/DC9, together with its price, the manner of its promotion, and Navegar's instructions for its use, attracted criminal and mentally ill segments of the civilian gun market, foreseeably leading to the kind of mayhem that has produced this lawsuit.

Other than duty, the only element of the negligence cause of action on which defendant claims entitlement to summary judgment is cause in fact. I would hold that plaintiffs have presented substantial evidence, creating a triable issue of fact, that Navegar's distribution of the TEC-9/DC9 in the general civilian market increased the risk and degree of harm to plaintiffs. The trial court thus erred in granting summary judgment for defendant.

### FACTS

Among the weapons Navegar has manufactured and marketed are two semiautomatic assault pistols,[1] the TEC-9 and the TEC-DC9. Two Navegar guns, TEC-DC9 serial Nos. D026484 and D032026, were used in the homicides leading to this lawsuit.

In 1992, Navegar renamed the TEC-9 as the TEC-DC9, but initially made no changes in its design or materials. In 1993, beginning with serial No.

---

[1]Both federal and California law define semiautomatic assault weapons by features and by make and model. The TEC-9 and TEC-DC9 are both specifically identified as "semiautomatic assault weapons" under federal law. (18 U.S.C. § 921(a)(30)(A)(viii).) California law also lists the TEC-9 as an assault weapon by name. (Pen. Code, § 12276, subd. (b)(4).)

D036673 (that is, after manufacture of the guns used here), the TEC-DC9 was slightly modified in design: the two sling catches on the side of the gun were removed and replaced with a single catch on the rear of the gun, altering the way it hung when carried on a shoulder sling.[2] Like the majority, I refer to the weapons involved here interchangeably as TEC-9's, TEC-DC9's, or TEC-9/DC9's.

During early 1993, Gian Luigi Ferri, a Southern California resident, bought two TEC-DC9's in Nevada. On July 1, 1993, Ferri took these weapons, as well as a .45-caliber Norinco Model 1911A1 pistol, into 101 California Street, a high-rise office building in San Francisco, carrying his guns and ammunition in a large briefcase and another bag on an airline-type luggage cart. He went to the 34th-floor offices of a law firm against which he sought revenge for perceived ill treatment. There, his TEC-DC9's carried on slings around his neck, and equipped with hundreds of rounds of ammunition loaded into 40- to 50-round magazines, Ferri moved through offices on this and two lower floors, firing in rapid bursts, ultimately killing eight men and women and wounding six others, before fatally shooting himself in a stairwell.

San Francisco Police Inspectors Napoleon Hendrix and Prentice Earl Sanders led the investigation of the crimes committed by Ferri at 101 California Street. Based on his interviews and inspection of the physical evidence at the scene of the killings, Hendrix believed "Mr. Ferri had a very specific strategy in mind for the use of the weapons. During the assault, particularly while on the 34th floor, he used the two TEC-DC9's to maximum advantage by relying on their high firepower. He used these weapons to lay down a field of fire that would either wound or immobilize his victims before using the .45 caliber pistol [to] finish them off in a more direct and personal manner." Inspector Sanders agreed that the "extended magazines" of the TEC-9/DC9, which held up to 50 rounds, "gave [Ferri] an opportunity to fire a much longer period of time of many more shots than he would have been capable of with . . . what might be determined to be a standard semiautomatic pistol." These extended magazines enabled Ferri "to lay down a blanket of fire rather than fire one individual shot, recover and then

[2]The company's reasons for renaming the gun are disputed: Carlos Garcia, the company's owner and former president, testified at his deposition that "DC" stood for "Defensive Carry," referring to the intended relocation of the sling catch. However, Navegar's former national sales and marketing director, Michael Solodovnick, testified that the name change was unrelated to any design change. Garcia told him "DC" referred instead to the District of Columbia, which had passed a law imposing strict liability on manufacturers of specified assault weapons, including the TEC-9; the name change was an attempt to avoid prohibitions or liability under such laws. James Hodges, Jr., Solodovnick's successor, confirmed Solodovnick's explanation of the name change.

fire another individual shot, with the TEC-DC9. He was able to lay down what, in essence, would be a blanket of fire which would cover a large area, thus cutting the chances of intended targets to escape."

The TEC-9/DC9 is a semiautomatic descendent of a class of firearms called machine pistols, automatic weapons that are themselves derived from submachine guns. According to Leonard J. Supenski, a police chief and broadly experienced firearms expert, machine pistols are "typically issued to specialized forces such as security personnel, special operations forces, or border guards." They "offer an individual soldier maximum firepower in a small, light-weight, easily maneuverable package, and are especially effective on multiple adversaries in close quarters where precisely aimed shots are not as important as a lot of approximately placed shots." The TEC-9/DC9 differs from a machine pistol only in that it fires semiautomatically; even so firing, however, the gun's standard 32-round magazine "can be emptied in seconds." San Francisco Police Inspector Hendrix noted that with the commercially available trigger modification Ferri had installed, the rate of fire approaches that of an automatic weapon, i.e., hundreds of rounds per minute.

The TEC-9/DC9 differs from conventional handguns in several ways, many of which tend to make it particularly attractive to criminals and unsuitable for lawful civilian uses:

(1) Navegar sold the TEC-9/DC9 with a large capacity (32-round) detachable magazine, designed, according to Supenski, "to deliver maximum firepower by storing the largest number of cartridges in the smallest . . . space," providing a level of firepower "associated with military or police, not civilian, shooting requirements." The typical home self-defense scenario requires no more ammunition than is available in a standard six-shot revolver or six- to 10-round pistol. Because of a defender's tendency to keep firing until the magazine is empty, and given the TEC-9's relative inaccuracy and difficulty of aiming, the gun's high capacity is a threat to bystanders, and hence more of a hazard than a benefit in ordinary civilian self-defense. On the other hand, for those contemplating aggressive violence the TEC-9's extraordinary firepower, concealability, and modest price (less than $300 retail before the federal ban) were attractive features.

(2) The TEC-9/DC9 has a barrel shroud, also peculiar to military-patterned weapons, which disperses the heat generated by the rapid firing of numerous rounds of ammunition and allows the user to grasp the barrel and hold the weapon with two hands, facilitating spray firing. The gun's paramilitary look, in which the barrel shroud is a prominent feature, makes it and

similar guns especially intimidating, an aesthetic feature Supenski notes is "not lost on certain criminals, gang members, drug dealers, and some with psychological problems." As Navegar's owner, Carlos Garcia, explained, the barrel shroud makes the TEC-9 "look more like a machine gun."

(3) The TEC-9/DC9's barrel is threaded, allowing the attachment of silencers and flash suppressors, which are restricted under federal law (18 U.S.C. § 921(a)(24) & (30)(C)(ii)) and are primarily of interest to criminals. The threaded barrel also permits the attachment of a barrel extension (which Navegar sold as an accessory), enabling the weapon to be fired with higher velocity and at greater distances, and extending the length of barrel with which the shooter can hold the gun, while still allowing the gun to be broken down into smaller cancelable parts. The TEC-9, unlike assault *rifles* with similar firepower (e.g., AK-47's and AR-15's), is, as Supenski stated, "capable of being hidden under a car seat, in a duffel bag, or slung under a jacket." The barrel extension also has the effect of extending the barrel shroud, adding to the pistol's machine-gun-like appearance.

(4) Prior to the 1993 design change described earlier, the TEC-9/DC9 (including the two guns Ferri bought and used) came with two side sling catches, allowing the gun (which is too large for a holster) to hang horizontally at the hip when slung from the shoulder or neck. This configuration, which Navegar, in discovery, characterized as a "military-like" hanging position, holds the TEC-9/DC9 ready for firing from the hip and permits two of the guns to be carried and used while on the move, as was done by Ferri in this case.

Chief Supenski stated that the TEC-9, which is relatively inaccurate and had poor sights, is "completely useless" for hunting and is not used by competitive shooters. The weapon is designed to engage multiple targets during rapid, sustained fire. It has little, if any, practical value for self-defense and is hazardous when used for that purpose due to its weight and forward balance (making it hard to fire with one hand), inaccuracy, and firepower, he stated. Although guns like the TEC-9 are typically promoted as "fun guns" because of the large number of rounds they can shoot in a short time, and as "plinkers" because they can be used to shoot informal targets such as bottles and cans, because the nine-millimeter parabellum ammunition the TEC-9 uses is relatively expensive (between $10 and $15 per box of 50 rounds), "the 'fun' can get quite expensive in short order." Navegar owner Garcia identified plinking as the TEC-9's only recreational use and agreed that a TEC-9 user could "spend[] a fortune" plinking (a fact Garcia hoped would spur TEC-9 owners to also purchase one of Navegar's TEC-22 guns, which use much cheaper .22-caliber ammunition).

Supenski's research for an association of police chiefs of large American cities found that the TEC-9 was "far and away" the leading assault weapon seized by law enforcement agencies in such cities in 1990 and 1991, "accounting for 24% of all assault weapons seized, and 42% of all assault pistols seized." A 1989 study by Cox Newspapers, using previously unanalyzed gun-trace data from the Bureau of Alcohol, Tobacco and Firearms (BATF) (that is, information on guns that had been used in crimes and whose chain of ownership was traced by the BATF at the request of law enforcement agencies), found that the use of assault weapons in crime rose dramatically between 1987 and 1988, that assault weapons are 20 times more likely to be used for criminal purposes than are conventional weapons, and that of the assault weapons traced, one in five was a TEC-9. The Cox study concluded the TEC-9 was "the nation's No. 1 assault weapon of crime" and "the favorite of drug dealers, apparently because it is inexpensive . . . easily concealed and is available with a 36-round magazine." A 1994 BATF report on the TEC-9 found it was among the 10 most frequently traced guns in 1991 through 1993. Total traces for the TEC-9/DC9 and TEC-22 in 1990 through 1993 numbered 3,710, including 319 murder cases and 234 cases of assault.

Trace requests from the BATF came by phone or fax and were individually answered by Navegar employees. Garcia, Navegar's owner and sometime president, was aware that the Cox Newspapers study had found the TEC-9 was traced "quite a bit," but he changed nothing in his design or marketing of the gun as a result of that knowledge. Garcia explained to the Cox Newspapers reporter, "The only reason it's No. 1 on your list is because mine is the lowest price. The next highest-priced gun of the assault weapons is two and a half times my cost." Garcia also stated, "I know some of the guns going out of here end up killing people, but I'm not responsible for that."

Michael Solodovnick, the company's national sales and marketing director from 1989 to 1993, was also aware of trace requests and of media reports that the TEC-9 was favored by drug dealers, but he did not take or discuss with Garcia any measures to keep the gun out of criminal hands, because as a manufacturer Navegar "ha[d] no control over that." In fact, Solodovnick (who is also known as Mike Solo) believed that news reports of the TEC-9 being used in a sensational murder or other crime, and condemnation of the weapon by law enforcement and other government officials, simply helped sales. He acknowledged having been correctly quoted in a 1992 New York Times article, as follows: " 'I'm kind of flattered,' Mr. Solo said when he was asked about condemnations of the TEC-9. 'It just has that advertising tingle to it. Hey, it's talked about, it's read about, the media write about it.

That generates more sales for me. It might sound cold and cruel, but I'm sales oriented.' " He also acknowledged saying, with reference to well-publicized violent incidents involving assault weapons, that "whenever anything negative has happened, sales have gone tremendously high."

Navegar advertised the TEC-9/DC9 in a number of nationally distributed gun-related magazines. A typical advertisement, from the October 1991 issue of Soldier of Fortune, was titled "Higher TEC." The ad showed a photograph containing several versions of the TEC-9, accompanied by the following text: "At two-thirds the weight (and price) of an Uzi, the TEC 9 series clearly stands out among high capacity 9mm assault-type pistols. [¶] Ounce for ounce they deliver more gutsy performance and reliability than ANY other gun on the market. [¶] TEC-9's are built tough for rugged weather and terrain. And they're built comfortable with an ergonomically designed grip and frame—32 rounds of firepower make them ideal for self-defense or recreation. Simple, two-step disassembly for easy cleaning makes them convenient. [¶] In Standard or Mini version, blued, stainless steel, or our new 'TEC-KOTE' finish, the TEC-9's offer rugged, reliable, affordable technology."

Navegar also gave, sold or loaned TEC-9/DC9's to the producers of violent films, such as RoboCop (Orion Pictures Corp. 1987) and Freejack (Warner Brothers 1992), and television programs, such as *Miami Vice*, who wanted a weapon with a "menacing" or "intimidating" look. In Solodovnick's opinion, use of the weapon in such films and television programs was beneficial to sales.

In the manual distributed with the TEC-9/DC9, Navegar described it as "a radically new type of semi-automatic pistol, designed to deliver a high volume of firepower." The gun could be used in "modes of fire impossible with most handguns" and could be fired from many positions, including a two-handed hold described as "[h]ipfire at shortest range."

According to Garcia and Solodovnick, Navegar's target market for advertising of the TEC-9/DC9 included "gun enthusiast[s] . . . people that enjoy shooting" as well as "Walter Mitty" types, who would use the gun to "play military." Such a person "dresses up in a military outfit, and goes there [to a gun show] like he's a soldier, but he's not really, but he plays this game, and he likes it." Also in the customer base was the "survivalist community" and people who believed the weapon would be effective protection against a government "takeover" by "Communists" who might "corrupt our law enforcement agencies."

Although he believed any gun could be an "assault weapon," Garcia agreed that Navegar's advertising of the TEC-9/DC9 as an "assault-type"

gun conveyed the idea that it could be used to initiate fire in an "offensive-type situation." Garcia acknowledged that the threaded barrel, which allowed attachment of silencers and flash suppressors (as well as barrel extensions), was one of the features of the TEC-9/DC9 emphasized in Navegar's advertising. Garcia could think of no reason a law-abiding citizen using the TEC-9/DC9 would be interested in a sound suppressor; that would suggest "a criminal purpose." Navegar sold an accessory it called a "recoil compensator" but which it advertised would reduce muzzle flash as well.

Plaintiffs' first amended complaint included three causes of action against Navegar: negligence per se (alleging Navegar violated the AWCA by advertising the TEC-9/DC9 in California); strict liability for an abnormally dangerous activity (making and selling the TEC-9/DC9); and "common law negligence."

As to common law negligence, plaintiffs alleged that Navegar knew or should have known that the TEC-9/DC9 was "particularly well adapted to a military-style assault on large numbers of people"; that it is "disproportionately associated with criminal activity"; that the gun's firepower and other features, as well as the reputation created by publicity surrounding the gun, "make the weapon more attractive to criminals"; and that the gun "would be used to kill or injure innocent persons in violent criminal acts such as the mass killing committed by Ferri." Navegar acted negligently "by manufacturing, marketing, and making available for sale to the general public" the TEC-9/DC9.

The trial court granted Navegar's motion for summary judgment on all causes of action. Plaintiffs appealed the grant of summary judgment only as to the common law negligence and ultrahazardous activity causes of action. A divided Court of Appeal reversed as to negligence, and this court granted Navegar's petition for review.

## DISCUSSION

The elements of an action for negligence are the existence of *duty* (the obligation to other persons to conform to a standard of care to avoid unreasonable risk of harm to them); *breach of duty* (conduct below the standard of care); *causation* (between the defendant's act or omission and the plaintiff's injuries); and *damages*. (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 614 [76 Cal.Rptr.2d 479, 957 P.2d 1313].) The only issues contested at the present stage of these proceedings are the existence and scope of Navegar's duty and the sufficiency of the evidence that its allegedly negligent activities were a cause in fact of plaintiffs' injuries.

Summary judgment is proper where there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) Two of the issues on review here—the existence of a duty and the effect of Civil Code section 1714.4—are purely legal. The third, causation, is factual, the question being whether plaintiffs have brought forward sufficient evidence to justify a trial on the causation issue.

## I. *Existence of Duty*

Navegar contends a gun manufacturer owes *no* duty of care to persons injured by the criminal misuse of its product by a remote purchaser. The gunmaker urges us to hold that there is no basis "for the imposition of any duty on Navegar for engaging in the lawful manufacture, distribution and sale of its products." Plaintiffs, phrasing the same issue in inverse terms, ask us to decide whether "gun manufacturers enjoy a complete exemption from tort liability regardless of how negligently and dangerously they act in designing, distributing, and marketing their products." They argue for the conclusion that "Navegar owed [plaintiffs] a legal duty to exercise due care in designing, distributing, and marketing firearms." The first question to be addressed, therefore, is whether Navegar owed plaintiffs—members of the public killed or injured by another person's criminal use of a Navegar firearm—*any* duty of care. Did Navegar, in the conduct of its gunmaking and gun selling business, have an obligation to use reasonable care to avoid injuries and deaths from the criminal use of its TEC-9/DC9 firearms?

The existence of a duty is a question of law to be determined by the court alone. (*Artiglio v. Corning Inc., supra,* 18 Cal.4th at p. 614; *Parsons v. Crown Disposal Co., supra,* 15 Cal.4th at p. 472 (*Parsons*).) Although duty must be determined individually as to each class of cases, and has been described as " ' " 'only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection' " ' " (*Parsons, supra,* at p. 472, italics omitted), the court nonetheless should be guided by certain general principles.

The first touchstone has been set by the Legislature, with the fundamental precept that "[e]very one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person . . . ." (Civ. Code, § 1714, subd. (a).) This court has, naturally, been chary of exceptions to the legislative rule: "Although it is true that some exceptions have been made to the general principle that a person is liable for injuries caused by his failure to exercise reasonable care in the circumstances, it is clear that in the absence of statutory provision declaring an exemption to the fundamental

principle enunciated by section 1714 of the Civil Code, no such exception should be made unless clearly supported by public policy." (*Rowland v. Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] (*Rowland*).)

We have, in several cases, outlined the considerations employed in various contexts to determine the existence and scope of duty (sometimes referred to as the *Rowland* factors): " 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Parsons, supra,* 15 Cal.4th at p. 473; *Ballard v. Uribe* (1986) 41 Cal.3d 564, 572-573, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624]; *Rowland, supra,* 69 Cal.2d at p. 113.) We have, moreover, explained that while foreseeability plays a "very significant" role in this analysis, the question before a court on the issue of duty is not the specific foreseeability of the particular plaintiff's injuries, but, rather, "whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Ballard, supra,* at p. 573, fn. 6.)

Apart from foreseeability, the chief factor in determining whether deliberate conduct may give rise to negligence liability is " 'the social value of the interest which the actor is seeking to advance.' " (*Parsons, supra,* 15 Cal.4th at p. 473, italics omitted; *Schwartz v. Helms Bakery Limited* (1967) 67 Cal.2d 232, 237, fn. 3 [60 Cal.Rptr. 510, 430 P.2d 68].) A duty of care will not be held to exist even as to foreseeable injuries, in other words, where the social utility of the activity concerned is so great, and avoidance of the injuries so burdensome to society, as to outweigh the compensatory and cost-internalization values of negligence liability. (*Elden v. Sheldon* (1988) 46 Cal.3d 267, 274 [250 Cal.Rptr. 254, 758 P.2d 582]; *Parsons, supra,* at p. 476.)

### Foreseeability

Considering foreseeability first, the record leaves no doubt that the use of the TEC-9/DC9 in criminal violence was, as a general matter, foreseeable to Navegar. BATF trace requests, as well as media reports of systematic studies and specific violent incidents, all put Navegar's officers on clear notice the TEC-9/DC9 was widely favored for violent criminal uses. More generally, the growing numbers of semiautomatic assault weapons on the nation's

streets, and their well-publicized use against both police officers and civilians, was a major subject of legal and political notice in the 1980's and early 1990's, leading to the AWCA in 1989 and federal restrictions in 1994. (See Diaz, Making a Killing: The Business of Guns in America (1999) pp. 120-133.) The TEC-9, a prominent member of this growing group of guns, was among the 10 most frequently traced guns *of any type* each year from 1989 through 1993. (*Id.* at pp. 27-28.)

Indeed, the record in this case shows not only foreseeability but *foresight itself.* Navegar's owner, Carlos Garcia, candidly acknowledged that the TEC-9/DC9's low price, relative to other assault weapons, led to its favored status among criminals; he further acknowledged that, "I know some of the guns going out of here end up killing people," though he denied he was "responsible" for such fatal uses. Similarly, Michael Solodovnick, the company's national sales and marketing director during the period relevant here, was aware of the BATF trace requests and of media reports that the TEC-9/DC9 was favored by drug dealers. He disregarded these reports, he stated, not because he disbelieved them, but because Navegar had "no control" over criminal users of its guns. Solodovnick, indeed, celebrated government condemnations of the TEC-9/DC9 for its reported use in violent crime, rather than disputing or minimizing such reports, because he believed the gun's association with criminal violence was good for sales. Navegar, understandably, has not argued to this court that criminal use of the TEC-9/DC9 was unforeseeable.

### Social Burden of Potential Liability

Turning to social utility, neither the record nor the briefs demonstrate that the manufacture and sale of the TEC-9/DC9 or similar weapons are activities of such value to society that Navegar and its fellow makers of assault weapons must be protected against the threat of liability for their negligent acts in designing, marketing and distributing such firearms. Here the potential for negligence liability does not, for example, threaten a wide range of socially vital industrial activities (see *Parsons, supra,* 15 Cal.4th at pp. 473-475), tend to prevent exercise of a constitutional right (see *Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814 [59 Cal.Rptr.2d 756, 927 P.2d 1260]), or pose a risk of disrupting the government's response to a public emergency (see *Macias v. State of California* (1995) 10 Cal.4th 844, 856-859 [42 Cal.Rptr.2d 592, 897 P.2d 530]). To the contrary, at stake is nothing more than a gunmaker's ability to make and sell on the civilian market, unfettered by potential negligence liability, a type of firearm that Congress and our own Legislature have found *highly dangerous to public safety and of relatively little value for recreation, hunting, and other*

*legitimate uses*. Society, it seems clear, assigns a low utility to unrestricted distribution of the TEC-9/DC9.

The Supenski declaration and the deposition testimony of Navegar officers Garcia and Solodovnick lend independent support to the same conclusion. The only recreational use Garcia identified for the TEC-9/DC9 was "plinking," i.e., informal target shooting, certainly a lawful activity but hardly a vital social function or one for which the TEC-9/DC9, with its high ammunition cost, is especially well suited. Neither armed resistance to law enforcement nor "play[ing] military," other intended uses Garcia and Solodovnick identified for the TEC-9/DC9, are of recognized high social utility. The defense of self and home *is* an important social value and right (see, e.g., Cal. Const., art. I, § 1), but, as Supenski opined and Solodovnick agreed in part, the TEC-9/DC9 is not particularly well suited for that use, considering the caliber and type of ammunition it fires, its extraordinarily high capacity, and its inaccuracy (in Garcia's words, the gun "has a tendency to sort of dance on you," when fired with one hand). Recognizing potential negligence liability for the manufacture and distribution of assault pistols like the TEC-9/DC9 could not be expected to substantially interfere with Californians' ability to protect themselves and their families against criminal violence.

Navegar contends such value judgments are not for the courts to make at all, but are purely a legislative matter. The Legislature, of course, has in some respects limited gunmakers' liability in Civil Code section 1714.4, as I discuss hereafter. But at this stage of the analysis the question is only whether Navegar is immune from *all* potential negligence liability based on the manufacture and distribution of the TEC-9/DC9. In answering this question the court may—indeed, must—make a set of judgments about, inter alia, the "consequences to the community of imposing a duty to exercise care with resulting liability for breach." (*Rowland, supra,* 69 Cal.2d at p. 113; see *Moning v. Alfono* (1977) 400 Mich. 425 [254 N.W.2d 759, 763] [reversing directed verdict for the manufacturer in negligent marketing action by a child injured through a playmate's use of a slingshot: "The interest of children in ready-market access to slingshots is not so clearly entitled to absolute protection in comparison with the interest of persons who face the risk thereby created as to warrant the Court in declaring, as a rule of common law, that the risk will be deemed to be reasonable"].) To hold here on grounds of social utility that Navegar owed plaintiffs *no* duty would be to make the judgment that manufacture and sale of the TEC-9/DC9 and other assault pistols are of such value to society as to require total immunity from negligence liability. No basis appears for such a judgment.

The Legislature, moreover, has considered the social utility of the TEC-9/DC9 and like weapons in detail and has stated its view unequivocally in

the AWCA: "The Legislature has restricted the assault weapons specified in Section 12276 based upon finding that each firearm has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings." (Pen. Code, § 12275.5.) Though the Legislature also recognized that many semiautomatic firearms, including some semiautomatic assault weapons, have legitimate uses (see *In re Jorge M.* (2000) 23 Cal.4th 866, 883-884 [98 Cal.Rptr.2d 466, 4 P.3d 297]), it believed the danger they posed greatly outweighed the social utility of their continued unrestricted sale and ownership. In *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 481-491 [97 Cal.Rptr.2d 334, 2 P.3d 581], we held the legislative scheme, albeit perhaps imperfect, was a rational response to a pressing public safety problem.

That federal law in 1993 did not yet prohibit manufacture of the TEC-9/DC9 does not reflect a national policy favoring or protecting assault pistols. A year after the killings here, Congress responded to this and other incidents with restrictions on manufacture and interstate sale of the TEC-9 and other semiautomatic assault weapons. (18 U.S.C. §§ 921(a)(30), 922(v)(1), added by Pub.L. No. 103-322 (Sept. 13, 1994) 108 Stat. 1796.) The reporting congressional committee noted that "[a] series of hearings over the last five years on the subject of semiautomatic assault weapons has demonstrated that they are a growing menace to our society . . . ." (H.R.Rep. No. 103-489, 2d Sess., p. 13 (1994).) During that time "evidence continue[d] to mount" that such firearms were favored by drug dealers, gangs, and other criminals (*ibid.*), and "[p]ublic concern about semiautomatic assault weapons has grown because of shootings in which large numbers of innocent people have been killed and wounded, and in which law enforcement officers have been murdered" (*id.* at p. 14). That Congress took several years to respond to the growing public safety problem posed by assault weapons does not suggest prior legislative *approval* of such weapons.

### Connection Between Conduct and Injury

No Navegar agent, of course, participated with Ferri in the 101 California Street massacre. Indeed, Navegar, which generally sold only to wholesale distributors, did not directly provide Ferri with any weapons. Thus Navegar, stressing that Ferri, rather than itself, directly caused the deaths and injuries at 101 California Street, argues that "liability for third party criminal conduct generally may be imposed only where there exists a special relationship between the defendant and either the victim or the third party actor, a requirement which is indisputably not present here."

We rejected a similar no-duty claim in *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40 [123 Cal.Rptr. 468, 539 P.2d 36] (*Weirum*). The

defendant radio station had, by a heavily advertised mobile giveaway contest, foreseeably incited a race along Los Angeles freeways. One of the drivers racing to the giveaway site negligently forced the car of the plaintiffs' decedent off the road, causing a fatal accident. (*Id.* at pp. 43-45.) To the defendant's contention, based on section 315 of the Restatement Second of Torts,[3] that it owed the decedent no duty of care because of the lack of a special relationship, we answered that "this rule has no application if the plaintiff's complaint, as here, is grounded upon an affirmative act of defendant which created an undue risk of harm." (*Weirum, supra*, at p. 48.)

We continued: "The rule stated in section 315 [of the Restatement Second of Torts] is merely a refinement of the general principle embodied in section 314 that one is not obligated to act as a 'good samaritan.' [Citations.] This doctrine is rooted in the common law distinction between action and inaction, or misfeasance and nonfeasance. Misfeasance exists when the defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk. Conversely, nonfeasance is found when the defendant has failed to aid plaintiff through beneficial intervention. As section 315 illustrates, liability for nonfeasance is largely limited to those circumstances in which some special relationship can be established. If, on the other hand, the act complained of is one of misfeasance, the question of duty is governed by the standards of ordinary care discussed above. [¶] Here, there can be little doubt that we review an act of misfeasance to which section 315 is inapplicable. Liability is not predicated upon defendant's failure to intervene for the benefit of decedent but rather upon its creation of an unreasonable risk of harm to him." (*Weirum, supra*, 15 Cal.3d at p. 49, fn. omitted.)[4]

Here, as in *Weirum*, plaintiffs seek not imposition of a duty of rescue or prevention, but rather, application of the ordinary duty (Civ. Code, § 1714,

---

[3]The cited section provides: "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless [¶] (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or [¶] (b) a special relation exists between the actor and the other which gives to the other a right to protection." (Rest.2d Torts, § 315.)

[4]Accord, *Coulter v. Superior Court* (1978) 21 Cal.3d 144, 148, 155-156 [145 Cal.Rptr. 534, 577 P.2d 669], abrogated by Civil Code section 1714, subdivisions (b) and (c) (special relationship required only as to cause of action alleging host "permitted" person to drink before driving, not as to cause of action alleging host "furnished" person with alcoholic beverages); *Pamela L. v. Farmer* (1980) 112 Cal.App.3d 206, 209-210 [169 Cal.Rptr. 282] (special relationship not required where defendant allegedly not only failed to prevent her husband from molesting visiting children, but encouraged and invited the children to visit under circumstances making the molestation foreseeable). See also *City of Boston v. Smith & Wesson Corp.* (Mass.Super.Ct. 2000) 12 Mass.L.Rptr. 225 [2000 WL 1473568, *15] (in city's action to recover public costs of gun violence in the city, court rejected defendants' contention that they bore no duty to protect against third parties' criminal conduct: "Here, too, Defendants misconstrue the complaint. Plaintiffs do not allege that Defendants were negligent for failure to protect from harm but that Defendants engaged in conduct the foreseeable result of which was to cause harm to Plaintiffs").

subd. (a)) to conduct one's activities with reasonable care for the safety of others. Plaintiffs' complaint is not that Navegar neglected to take actions that would have averted or alleviated a danger of attack from Ferri to which plaintiffs were already subject, but that Navegar's acts in making and marketing the TEC-9/DC9 unreasonably increased plaintiffs' risk of harm from such an attack.

Navegar responds that misfeasance and nonfeasance are concepts too "malleable," too subject to semantic manipulation, to serve as guides to duty. Though not sharply distinguishable in every case (see *Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 288 [80 Cal.Rptr.2d 196] [police conduct toward suicidal gunman could be characterized as overly confrontational action or as failure to act sensitively]), misfeasance and nonfeasance do mark a significant conceptual border. In any event, recognition of a distinction between action and inaction operates in favor of *defendants*; without such a distinction, *all* cases would fall within the ordinary rule that each person is responsible for his "want of ordinary care or skill in the management of his property or person" (Civ. Code, § 1714, subd. (a)) regardless of the existence of a special relationship between the defendant and the actor or victim. (See *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 435, fn. 5 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166] [special relationship requirement "derives from the common law's distinction between misfeasance and nonfeasance, and its reluctance to impose liability for the latter"].) Where, as here, the defendant's positive conduct of its business is claimed to have created or increased the risk of danger to the plaintiffs from attack by a third person, liability is not barred simply because the defendant had no special relationship with the third party actor or the victims.

Nor does the fact that Navegar's conduct and plaintiffs' injuries are linked only through Ferri's criminal act (a fact that could go either to duty or to proximate cause) necessarily bar liability; California follows the general tort law (see Rest.2d Torts, § 302B) in permitting responsibility for a third party's negligent, intentionally tortious, or even criminal acts to be traced back to the defendant whose negligent conduct foreseeably created the risk of such acts. (See, e.g., *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 58 [192 Cal.Rptr. 857, 665 P.2d 947]; *Richardson v. Ham* (1955) 44 Cal.2d 772, 777 [285 P.2d 269].) Although this court has not previously been called upon to address the duty those who make or sell firearms owe to victims of gun violence, we have recognized on the part of those controlling other

particularly dangerous instruments a duty of due care toward persons foreseeably injured by their misuse.[5] Decisions in many other jurisdictions, moreover, have recognized that defendant gun dealers, even absent any special relationship, may owe a duty not to create or increase the risk of danger from a third person's foreseeable negligent or criminal use of a firearm furnished or made available by the defendant.[6] As these cases illustrate, providers of guns may, under some circumstances, be held accountable for the foreseeable third party misuse of the weapon. Navegar's contention that its lack of a special relationship with Ferri, who misused defendant's gun for criminal purposes, eliminates all duty of care toward plaintiffs must be rejected.

### Degree of Moral Blameworthiness

The primary moral responsibility for plaintiffs' injuries undoubtedly rests with the assailant, Ferri. At the same time, one may note that whereas Ferri

[5]See *Richardson v. Ham, supra,* 44 Cal.2d at pages 775-777 (defendants left 26-ton bulldozer unlocked and unattended on top of mesa, where mischief-makers foreseeably started it and were unable to control it, causing property damage and personal injuries to those in its path); *Hergenrether v. East* (1964) 61 Cal.2d 440, 445 [39 Cal.Rptr. 4, 393 P.2d 164] (defendants left large truck unlocked, with key in ignition, in skid row area of city; truck thief, unable to control vehicle, collided with plaintiffs' vehicle on highway); *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 184-186 [203 Cal.Rptr. 626, 681 P.2d 893] (large commercial truck left unlocked, with keys in it, in unsecured lot in high-crime area); *Ballard v. Uribe, supra,* 41 Cal.3d at pages 573-574 (defendant left aerial basket lift at construction sight in dangerous condition and with keys in ignition; duty of care owed to employee of another contractor injured while using it).

[6]See, e.g., *Knight v. Wal-Mart Stores, Inc.* (S.D.Ga. 1995) 889 F.Supp. 1532, 1539 (firearm dealer has a duty of care, running to the public, to avoid selling a gun to a "mentally defective person," where such sale "could easily result in irresponsible use of the firearm and thus injury to the buyer or third parties"); *Cullum & Boren-McCain Mall v. Peacock* (1980) 267 Ark. 479 [592 S.W.2d 442, 444] (evidence that gun buyer acted strangely and said he wanted a gun "that would make a big hole" supported finding of negligence on part of seller); *Phillips as Tutrix of Phillips v. Roy* (La.Ct.App. 1983) 431 So.2d 849, 852 (recognizing duty to "refrain from selling a weapon to an individual manifesting signs of instability"); *City of Boston v. Smith & Wesson Corp., supra,* 2000 WL 1473568, *15 (defendant gunmakers' alleged conduct in creating an illegal secondary firearms market violated duty of care to avoid putting public at unreasonable risk of harm from foreseeable criminal misuse of firearms); *Howard Bros. of Phenix City, Inc. v. Penley* (Miss. 1986) 492 So.2d 965, 968 ("In this state, in this day and age we are simply not going to assert that there is no common law duty, aside from statute, for a dealer in firearms to have in effect . . . some safety precautions and procedures" to prevent sales to dangerous persons); *Peek v. Oshman's Sporting Goods, Inc.* (Tex.App. 1989) 768 S.W.2d 841, 847 (recognizing duty of ordinary care not to sell gun to person whose behavior "put[s] the seller on notice that the purchaser, if possessed of a firearm, would for[e]seeably pose a danger to third persons"); *Bernethy v. Walt Failor's, Inc.* (1982) 97 Wash.2d 929 [653 P.2d 280, 283] (recognizing duty not to furnish gun to intoxicated person). See contra, *City of Cincinnati v. Beretta U.S.A. Corp.* (Ohio Ct.App. 2000) 2000 WL 1133078, *5, appeal allowed, 740 N.E.2d 1111 (lead opinion finds municipal suit against gunmakers barred because "no special relationship" existed between defendants and perpetrators of gun violence).

apparently acted in the emotional grip of an irrational obsession, Navegar's president and marketing director apparently acted in the rational calculation of profit and market share. These corporate officers distributed in the general civilian market a menacing-looking handgun notable chiefly for its high firepower and relatively low price. Aware of the gun's disproportionate use by and popular association with violent criminals, they made no attempt to limit distribution or redirect marketing, instead celebrating the increased sales that came with notoriety. Great as it is, Ferri's blameworthiness does not completely eclipse Navegar's.

### Policy of Preventing Future Harm

Navegar argues that because it no longer makes (or, under the 1994 federal law, legally may make) the TEC-9/DC9, recognizing potential liability for harms inflicted by that gun "advances no legitimate policy concerns that are not already addressed by federal and state legislation," rendering *Rowland*'s "future harm" factor moot. (See *Rowland, supra,* 69 Cal.2d at p. 113.)

I disagree. Despite legislation restricting certain firearms, tort law may yet play a role in lessening gun violence. Whatever practical effect the California and federal laws restricting semiautomatic assault weapons may have, the gun industry will presumably continue to pursue innovation in search of new buyers and more sales. (While Navegar no longer makes or sells the TEC-9/DC9, it now makes and sells a similar nine-millimeter semiautomatic pistol called the AB (for "After Ban")-10, which accepts, and was initially sold by Navegar with, the pre-ban 32-round magazines.)

Because firearms are very durable and markets for traditional hunting guns have been stable or declining in recent years, "innovation . . . has become central to virtually everything the industry has done over the last two decades." (Diaz, Making a Killing: The Business of Guns in America, *supra,* at p. 93.) The search for innovative approaches to designing and selling firearms, according to Diaz, "could have taken any number of paths. The industry might, for example, have chosen to develop safer firearms— e.g., guns with passive safety devices such as childresistant locks and load indicators to show when they are loaded . . . . [¶] But gun industry executives deliberately chose to take exactly the opposite direction. . . . steadily increas[ing] the lethality of guns and ammunition. They have made guns to hold more rounds, increased the power of those rounds, and made guns smaller and more concealable." (*Id.* at pp. 95-96.) While one cannot predict what precise effect recent legislation and the continuing cultural reaction to gun violence will have on these trends, there is no reason to assume that

applying traditional principles of negligence to gunmakers and sellers would not have the salutary effect of encouraging safer design and marketing decisions in the future.

### Conclusion as to Existence of Duty

After consideration of the factors this court has previously held pertinent to the duty analysis, I would conclude that persons making and distributing semiautomatic assault weapons do owe the public, and hence those injured by the guns they supply, a duty of care in the conduct of their design, distribution and marketing activities. Considering, especially, the foreseeability of injury and the lack of significant social burden posed by potential liability, the circumstances simply do not call for a complete exemption from Civil Code section 1714's fundamental command that everyone be responsible for lack of care in the management of his or her property.[7]

As one writer explains, "Disposing of negligence suits against gun manufacturers . . . through the ipse dixit that manufacturers owe no duty to gun victims is equivalent to saying to gun manufacturers: it is irrelevant how you conducted your deadly business. It is irrelevant whether you acted recklessly or by design to increase the risk of death and grievous bodily injury posed by your products. It is irrelevant whether reasonable, feasible means existed by which you could have substantially reduced this risk. No other product manufacturer gets the luxury of complete immunity from legal responsibility." (McClurg, *The Tortious Marketing of Handguns: Strict Liability Is Dead, Long Live Negligence* (1995) 19 Seton Hall Legis. J. 777, 819 (*The Tortious Marketing of Handguns*).)

### II.   Scope of Duty

That Navegar owed the public a duty of care does not necessarily imply the scope of that duty is broad enough to encompass Navegar's allegedly

---

[7]Recently, in *Hamilton v. Beretta U.S.A. Corp.* (2001) 96 N.Y.2d 222 [727 N.Y.S.2d 7, 750 N.E.2d 1055, 2001 WL 429247] (*Hamilton*), the New York Court of Appeals answered in the negative the duty question certified to it by the federal court in *Hamilton v. Beretta U.S.A. Corp.* (2d Cir. 2000) 222 F.3d 36. The New York court, however, expressly distinguished the present California case as involving a "different factual context[] and different theories of negligent marketing not relevant here." (*Hamilton, supra*, 2001 WL 429247, at p. *7, fn. 6.) We agree that the two cases are distinguishable. Because the allegations in *Hamilton* involved gun manufacturers' failure to control retailers, the New York court relied in large part on the general lack of a duty " 'to control the conduct of third persons so as to prevent them from harming others' " (*id.* at p. *3), a principle that, as already discussed, has little or no application in our case, where negligence is claimed to lie in defendant's affirmative misfeasance. In addition, the only questions certified to the New York Court of Appeals were the existence of duty and the viability of market-share liability apportionment (*Hamilton, supra*, 2001 WL 429247, at p.*2), leading the New York court to fold into its duty analysis considerations more accurately addressed as deficiencies in the plaintiffs' proof of causation. In contrast, I address the causation issue, below, separately from the question of duty.

negligent conduct. In some instances this court has recognized the existence of a duty of care running from the defendant to the plaintiff, but limited its scope for reasons of constitutional or statutory policy.[8] In the case at bench, therefore, the first question is whether recognizing a duty of care in the marketing of a firearm the sale of which, at the time, was not barred by statute or regulation, would infringe a legislative prerogative. Second, consideration must be given to whether, in light of the legislative policy embodied in Civil Code section 1714.4, gunmakers' duty of care must be limited in a manner that precludes plaintiffs' claims of negligence.

In this part of the analysis, the focus is on plaintiffs' claim that Navegar acted negligently in distributing the TEC-9/DC9 broadly in the civilian market rather than limiting sales to buyers at low risk for criminal misuse, such as police and military purchasers. In their complaint, plaintiffs alleged Navegar breached its duty of care by "making [the TEC-9/DC9] available for sale *to the general public*." (Italics added.) In their opposition to the summary judgment motion in the trial court, plaintiffs likewise asserted Navegar "breached its duty to plaintiffs not to make a weapon of mass destruction available *to the general public*," and that the company's negligent conduct was in "sell[ing] the TEC-9 *to the general public*." (Italics added.) Again, in the Court of Appeal, plaintiffs described Navegar's negligent conduct as "selling *to the general public* a military-style assault pistol." (Italics added.) They went on to explain that "*if Navegar had restricted sales of the TEC-9 to the military and the police* . . . no tortuous conduct would be alleged." (Italics added.) In their briefing before us, plaintiffs have continued to locate negligence in Navegar's having "*widely distributed* a weapon uniquely suited for mass killing." (Italics added.) At oral argument, plaintiffs' attorney explained that Navegar should have restricted sales of the TEC-9/DC9 to the police, military, and possibly firing ranges.

Defendant contends, first, that to recognize plaintiffs' theory of negligence as legally viable would be to institute a "ban" on the TEC-9/DC9, a measure it argues is exclusively for Congress or the California Legislature. I disagree. Even a jury's finding in a product defect action that a particular product is defective because the risks of injury arising from the design outweigh the design's benefits (*Campbell v. General Motors Corp.* (1982) 32

---

[8]See, e.g., *Kentucky Fried Chicken of Cal., Inc. v. Superior Court, supra,* 14 Cal.4th at pages 823, 829 (commercial proprietor's duty of care toward patrons does not include duty to comply with a robber's demand for money; such a duty would be inconsistent with constitutional and statutory policy protecting right to defend property); *Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539, 546-555 [25 Cal.Rptr.2d 97, 863 P.2d 167, 27 A.L.R.5th 899] (duty of pharmaceutical maker to warn of product's dangers does not include duty to include label warnings in languages other than English, where state and federal law require only English-language labels).

Cal.3d 112, 118-120 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036]; *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 430 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1]) does not "ban" the product. While bearing strict liability for injuries arising from such a product, the defendant in such a case may legally continue to produce and distribute it. And even when such decisions will, in the long run, effectively drive a product from the market, California courts and juries are empowered to make them. Why, then, would a California jury not be permitted to determine whether, irrespective of product defect, a manufacturer's decision to sell the product to the general public, rather than restrict sales to a subgroup of specialized users, was imprudent? Such a claim, of course, is *more* difficult for plaintiffs to prove than one of product defect; plaintiffs must show the manufacturer knew or should have known the risks of injury created by its conduct and that a reasonably careful person would have taken measures to limit or end such distribution. (See *Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 383-387 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92] [though negligence liability requires proof of an element (negligence) in addition to defect and causation, plaintiff is entitled to instruction on negligence, as well as on strict liability for a defective product, when evidence supports both forms of liability].)

Courts in several jurisdictions have, in declining to recognize various theories of negligence against gunmakers, stated that the claims would require the judiciary to decide, in effect, what firearms may or may not be sold, a task seen as legislative by nature and tradition. As a New York court put it, "While there have been and will be countless debates over the issue of whether the risks of firearms outweigh their benefits, it is for [the] Legislature to decide whether manufacture, sale and possession of firearms is legal." (*Forni v. Ferguson* (1996) 232 A.D.2d 176 [648 N.Y.S.2d 73].)[9] To the extent these decisions confuse *negligent marketing* claims with proposals to judicially ban a product, they are unpersuasive for the reasons just discussed. To the extent they rely, implicitly, on notions of legislative preemption, they are inapplicable as well. Defendant has not asserted, nor has my research disclosed any evidence for, the claim that either Congress or

---

[9]See also, e.g., *City of Philadelphia v. Beretta U.S.A. Corp.* (E.D.Pa. 2000) 126 F.Supp.2d 882, 899-900 (manufacturers did not owe duty to public to police retail sales practices of licensed firearms dealers; such sales were already heavily regulated under federal and state law, and "public policy would seem to be opposed" to additional judicially created rules); *Linton v. Smith & Wesson etc.* (1984) 127 Ill.App.3d 676 [82 Ill.Dec. 805, 469 N.E.2d 339, 340] ("No Illinois decision has imposed a duty upon the manufacturer of a non-defective firearm to control the distribution of that product to the general public; such regulation having been undertaken by Congress, the Illinois General Assembly and several local legislative bodies"); *Forni v. Ferguson, supra,* 648 N.Y.S.2d at page 74 (manufacturer owes no duty "to refrain from the lawful distribution of a non-defective product").

the California Legislature intended, in their regulation of firearms manufacture, to preclude imposition of common law negligence liability for a manufacturer's imprudent decision to sell a particular model of firearm to civilians rather than only to military or police buyers. (See *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* (1995) 514 U.S. 645, 654 [115 S.Ct. 1671, 1676, 131 L.Ed.2d 695] [federal preemption is question of Congress's manifest intent; analysis starts with presumption against preemption].)

Plaintiffs' theory of negligence in the choice of distribution channels is neither unprecedented nor affected by the lack of a statutory prohibition on the distribution at issue. In *Moning v. Alfono, supra,* 254 N.W.2d 759, for example, the Michigan Supreme Court ordered a trial on a claim that the manufacturer and distributor of a slingshot were negligent in marketing it directly to children, though no statute prohibited such marketing. (*Id.* at pp. 763-764, 770-779.)[10] "Not surprisingly, courts have routinely recognized the duties of reasonable care that accompany the distribution of other dangerous, but perfectly legal, products." (*Hamilton, supra,* 222 F.3d at p. 44.) Indeed, the duty to exercise reasonable care in one's manner of distributing and marketing a product has been recognized in its application to the distribution of firearms, including the TEC-9/DC9 itself. (See *Bubalo v. Navegar, Inc.* (N.D.Ill., June 13, 1997, No. 96 C 3664) 1997 WL 337218, *7 [recognizing, under Illinois law, a limited duty of care in manner of marketing the TEC-DC9].)[11]

Second, the possible effect of section 1714.4 of the Civil Code (hereafter section 1714.4) must be considered. In that statute, our Legislature set a

---

[10]See also *Hunnings v. Texaco, Inc.* (11th Cir. 1994) 29 F.3d 1480, 1484-1487 (negligence for manufacturers and bulk shippers of poisonous mineral spirits to distribute and package in such a way as to allow foreseeable and dangerous repackaging in used milk containers by retailers); *Suchomajcz v. Hummel Chemical Company* (3d Cir. 1975) 524 F.2d 19, 24-25 (manufacturer and seller of chemicals used by purchaser to make illegal fireworks kits breached duty of due care in selling to a buyer that manufacturers knew or should have known would put the product to a dangerous use). For a negligent marketing claim more dependent on promotional activity, see *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 64-67 [107 Cal.Rptr. 45, 507 P.2d 653, 94 A.L.R.3d 1059] (pharmaceutical maker overpromoted its prescription drug through advertising and sales visits to physicians).

[11]See also Lytton, *Halberstam v. Daniel and the Uncertain Future of Negligent Marketing Claims Against Firearms Manufacturers* (1998) 64 Brook. L.Rev. 681, 686-689 (federal district court, applying New York law, allowed suit against gunmaker to go to jury on allegations manufacturer negligently marketed pistol to customers especially likely to engage in criminal misuse of the weapon); McClurg, *The Tortious Marketing of Handguns, supra,* 19 Seton Hall Legis. J. at pages 809-814 (describing alleged incidents and patterns of negligent marketing of firearms, including alleged promotion of guns for criminal use and failure to institute "safe sales" programs designed to prevent retail sales to criminals and the mentally ill).

definite public policy against imposing liability on makers of guns and ammunition pursuant to the risk-benefit theory of product defect. The question is whether this statutory policy encompasses plaintiffs' claim of negligent marketing. Contrary to the majority opinion, the answer is that it does not.

Section 1714.4 provides: "(a) In a products liability action, no firearm or ammunition shall be deemed defective in design on the basis that the benefits of the product do not outweigh the risk of injury posed by its potential to cause serious injury, damage, or death when discharged. [¶] (b) For purposes of this section: [¶] (1) The potential of a firearm or ammunition to cause serious injury, damage, or death when discharged does not make the product defective in design. [¶] (2) Injuries or damages resulting from the discharge of a firearm or ammunition are not proximately caused by its potential to cause serious injury, damage, or death, but are proximately caused by the actual discharge of the product. [¶] (c) This section shall not affect a products liability cause of action based upon the improper selection of design alternatives. [¶] (d) This section is declaratory of existing law."

On its face, as plaintiffs point out, section 1714.4 "has no application to this case," because plaintiffs do not claim liability for manufacture of a defective product. Section 1714.4, in general, does not affect a cause of action against a gunmaker or seller alleging negligent conduct. For example, the statute would clearly have no application where a retailer allegedly sold a gun negligently to a mentally ill or intoxicated buyer (see fn. 6, *ante*, citing such cases). Similarly, plaintiffs' claim that Navegar was negligent in *distributing the gun widely through civilian channels—but would not have been negligent in selling the gun to low risk groups such as police and military buyers*—appears readily distinguishable from the product defect actions that were the target of section 1714.4. A gun might be completely nondefective, and might even be particularly useful to a specialized group of legitimate users, although distribution of the same gun through unrestricted civilian commerce might be negligent because of the foreseeably high risk that a significant number in the general market will purchase the gun for violent use. (See *City and County of San Francisco v. Philip Morris, Inc.* (N.D.Cal. 1997) 957 F.Supp. 1130, 1140 [version of Civ. Code, § 1714.45 then in force, which barred product liability actions against manufacturers of tobacco products, did not apply to action alleging fraudulent marketing].)

An analogy may help convey the distinction. A Formula One racing car is not *defective* by virtue of its extraordinary maximum speed, high power-to-weight ratio, or gearing adapted to rapid acceleration. These are some of the characteristics that make it particularly suitable for a specialized group of

users. Yet a manufacturer's decision to sell such racing cars to the general public through automobile dealerships everywhere, without imposing any special limitation on purchasers, might be deemed negligent because the use of such cars by untrained drivers on public roads would pose a foreseeably high risk of accidental injury.

Similarly, the evidence presented on summary judgment in this case tended to show that the TEC-9/DC9 is designed to engage multiple targets at close range during rapid, sustained fire, making it, to quote Chief Supenski, well suited to combat with "multiple adversaries in close quarters." Military and some police users (e.g., SWAT units) have a legitimate need for weapons with this capacity for assaultive violence. The civilian public does not. The evidence also tends to show that a significant segment of the gun-buying public purchased TEC-9/DC9's for violent misuse and that Navegar executives knew or should have known that sales to the general public created a significant risk of violent misuse.

In claiming Navegar breached its duty of care by selling the TEC-9/DC-9 to the general public, as opposed to the smaller group of low-risk buyers for whom it may be well suited, plaintiffs are not claiming the gun is defective, that it should not have been made or sold at all, or, in the terms of section 1714.4, that the "benefits of the product do not outweigh the risk of injury posed by its potential to cause serious injury, damage, or death when discharged" (§ 1714.4, subd. (a)). Though plaintiffs' claim does require a weighing of risks and benefits, the risks and benefits involved are not those of *the product as such*, but those created by defendant's choice of distribution channels.

The legislative history of Assembly Bill No. 75 (1983-1984 Reg. Sess.) (hereafter Assembly Bill No. 75), by which the Legislature enacted section 1714.4 in 1983, confirms that, in the version finally enacted, it was not intended to preclude claims that a gunmaker's strategic marketing choices were negligent.

Assembly Bill No. 75 originated as a legislative response to the filing of several lawsuits seeking to hold the manufacturers of certain guns, mainly inexpensive handguns ("Saturday Night Specials"), liable for injuries caused by the use of these guns in violent crimes on the ground that the guns were defective products. The plaintiffs in these cases were said to argue that the firearms were defective "because the danger posed by such items far outweighs any social benefits." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 75, as amended May 11, 1983, p. 1.)

As passed by the Assembly, the bill was not limited to product defect claims. The Assembly-approved version provided, much more broadly, as

follows: "Except where there is a manufacturing or design defect which causes a firearm or ammunition to malfunction or where the furnishing of a firearm or ammunition is prohibited by statute, no person, organization, or public or business entity of any kind may be held legally accountable for damages of any type, whether to persons, property, or for the death of any person, suffered as the result of the furnishing, with or without consideration, of a firearm or ammunition."

The Assembly-approved bill would clearly have precluded plaintiffs' claims of negligence here, as well as many other claims of negligence in the furnishing of a firearm (although an exception for negligent "entrustment" had been added by amendment in the Assembly). But the Assembly language was eliminated in the Senate on August 24, 1983, and replaced with the very different language that now appears in section 1714.4. Thus, the Senate eliminated the bill's broad grant of immunity for liability arising from "the furnishing of firearms," together with its narrow exception for claims of defect causing "malfunction," and replaced them with a threshold limitation of the bill's application to "a products liability action," as well as with more specific references to the risk-benefit theory of design defect outlined in *Barker v. Lull Engineering, Co., supra,* 20 Cal.3d 413.

Thus, an apparent purpose of the Senate amendments, which survived conference and were enacted into law, was to preserve possible actions based on negligent "furnishing" of firearms. Committee reports confirm this purpose. (See Sen. Com. on Judiciary, Rep. on Assem. Bill No. 75, as amended May 25, 1983, pp. 3-4; Assem. Com. on Judiciary, Conf. Rep. on Assem. Bill No. 75, Sept. 15, 1983, pp. 1-2.) The legislative history, therefore, confirms what the language of section 1714.4 itself states, that the statute's subject matter was solely liability for defective products; the statute was not intended to affect liability for negligence in the manner and means by which firearms are distributed and marketed.

Isolating plaintiffs' assertions that Navegar was negligent in its manufacture or design of the TEC-9/DC9, the majority attempts to paint plaintiffs' entire negligence claim as one of product defect. But plaintiffs have consistently asserted, as well, that Navegar acted negligently in distributing the TEC-9/DC9 to the civilian public. In their complaint, for example, plaintiffs alleged Navegar "acted negligently by manufacturing, *marketing, and making available to the general public*" the TEC-9/DC9. Similarly, in their briefing, plaintiffs assert Navegar "negligently designed, *distributed, and marketed*" the weapon. Even assuming section 1714.4 bars claims of negligent design, the statute clearly has no application to plaintiffs' negligent distribution and marketing claims.

Nor is the majority correct that unless plaintiffs' claim of negligent marketing is deemed to be within the scope of section 1714.4, that statute will be too easily evaded by artful pleading. Plaintiffs have not merely pleaded that Navegar was negligent in marketing the TEC-9/DC9 "to the general public"; plaintiffs have identified both a *nonnegligent* market for the firearm and aspects of the TEC-9/DC9 and of Navegar's actual marketing that a jury reasonably could find made the company's decision *not* to restrict distribution to that market careless. They have not simply avoided the use of the term "defect"; rather, they have articulated, and presented sufficient evidence to support, a theory of negligence that rests in no respect upon a claim of defect. Section 1714.4 would not be rendered useless by the reading I urge, as it would remain applicable to the claims of product defect the Legislature intended to bar.

I conclude, therefore, that neither proper deference to legislative authority nor the legislative policy embodied in section 1714.4 precludes recognition of Navegar's ordinary duty of due care in its choice of marketing strategies.

### III. *Cause in Fact*

Focusing still on plaintiffs' theory of negligence in the manner in which Navegar marketed the TEC-9/DC9, it must be asked, finally, whether plaintiffs put forward sufficient evidence to present a triable issue on causation. More specifically, is there substantial evidence that Navegar's assertedly negligent conduct in distributing the TEC-9/DC9 to the general public was a substantial factor contributing to plaintiffs' injuries? I believe the answer is yes.

First, since Gian Luigi Ferri did not have any known means of purchasing weapons restricted to police and military buyers, he would probably not have been able to purchase TEC-9/DC9's had Navegar so restricted their sale. A reasonable juror, certainly, could so infer. Second, plaintiffs have put forward substantial evidence, creating a triable issue, that Ferri's use of two TEC-9/DC9's in the attack contributed as a substantial factor to plaintiffs' personal injuries, at least in the sense of increasing the deaths and injuries Ferri inflicted beyond what he would likely have inflicted under the same circumstances and in the same time period with a conventional handgun.[12] The declarations and testimony of Chief Supenski and Inspectors Hendrix and Sanders created at the least a triable issue as to whether the concealability, firepower, designed suitability for hipfire, and other features of the

---

[12]See *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 969 [67 Cal.Rptr.2d 16, 941 P.2d 1203] (conduct is a substantial factor in causing injury if it contributes more than nominally or theoretically to the injury; substantiality does not refer to the amount or proportion of the harm caused by the defendant's conduct, an issue addressed, instead, through comparative negligence principles).

TEC-9/DC9 allowed Ferri to kill and injure more victims than would have been possible without those features. Evidence was presented also that the TEC-9/DC9 was significantly less expensive than similar weapons of other makes, from which a jury could reasonably infer Ferri was thereby enabled to purchase *two* concealable assault weapons instead of one, further increasing his firepower. The record evidence thus presents a triable issue of fact as to whether Navegar's allegedly negligent decision to sell the TEC-9/DC9 on the open civilian market, rather than restrict its purchase to firing ranges and police and military users, was a substantial factor in causing plaintiffs' injuries.

Navegar's duty of care being established by law, and evidence of causation being sufficient, I conclude the trial court erred in granting summary judgment for Navegar on plaintiffs' cause of action for common law negligence. I would, therefore, affirm the judgment of the Court of Appeal.

The majority's contrary decision has one virtue: it rests entirely upon application of section 1714.4. If, as I have argued, the majority misapprehends the scope and intent of that statute, the Legislature may remedy the mistake by amending or repealing section 1714.4. But until such action is taken, gunmakers, including makers of assault weapons banned in California, will apparently enjoy absolute immunity from the consequences of their negligent marketing decisions.